Donald R. SHADRICK and wife, Valerie
Shadrick, Plaintiffs/Appellees,

v.

Wesley L. COKER, M.D.,
Defendant/Appellant.

Supreme Court of Tennessee,
at Nashville.

Feb. 17, 1998.

G. Thomas Nebel, John B. Carlson, Williams/Nebel & Associates, P.C., Nashville, for Plaintiffs–Appellees.

Sam B. Blair, Jr., Baker, Donelson, Bearman & Caldwell, Memphis, for Amici Curiae, American Medical Association and Tennessee Medical Association.

Robert T. Trentham, G. Brian Jackson, Trabue, Sturdivant & Dewitt, Nashville, for Defendant–Appellant.

## OPINION

DROWOTA, Justice.

In this lack of informed consent medical malpractice action, the defendant, Wesley L. Coker, M.D., appeals from the Court of Appeals' reversal of summary judgment entered by the trial court in his favor based on the expiration of the applicable statute of limitations and statute of repose. The issue for our determination is whether the claims of the plaintiffs, Donald Shadrick and Valerie Shadrick, are barred by the one-year statute of limitations or the three-year statute of repose for medical malpractice actions. *See* Tenn.Code Ann. § 29–26–116.[1] After carefully examining the record before us and considering the relevant authorities, we conclude that disputed issues of material fact exist regarding (1) when the statute of limitations began to run and, (2) whether the fraudulent concealment exception to the statute of repose applies. Accordingly, for the reasons explained hereafter, we affirm the decision of the Court of Appeals to reverse the trial court's grant of summary judgment to the defendant.

## BACKGROUND

The plaintiff, Donald Shadrick, injured his back at work in December 1988. He was treated for this injury by the defendant, Wesley L. Coker, M.D., an orthopedic surgeon practicing in Nashville. On March 12, 1990, after three previous surgeries performed by Dr. Coker failed to alleviate Shadrick's back pain, Dr. Coker performed a laminectomy and disc excision. This surgery was done at West Side Hospital in Nashville, which is now Centennial Medical Center. During the March 12 surgery, Dr. Coker inserted "pedicle screws"[2] and related hardware into Shadrick's spine to provide stability and help the vertebrae fuse together. According to Shadrick's testimony, which must be assumed to be true for purposes of summary judgment analysis, "no one told [him] before the operation that screws would be implanted" in his back and "nobody ever told [him] about any risk of injury or any problems that could be caused by the screws." When Shadrick woke up after the surgery, he was told by Dr. Coker that the screws had been put in his back and that the screws were "routine treatment" for the type of surgery he had undergone.

---

1. Tenn.Code Ann. § 29–26–116 provides for a one-year statute of limitations in malpractice actions, but "[i]n the event the alleged injury is not discovered within said one (1) year period, the period of limitation shall be one (1) year from the date of such discovery. In no event shall any action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant in which case the action shall be commenced within one (1) year after discovery that the cause of action exists." Tenn.Code Ann. § 29–26–116(a)(1), (2) and (3).

2. The "pedicle" is part of the vertebra.

Following the March 12 surgery, Shadrick's pain worsened. He would fall on his buttocks when his "leg went out" due to pain. Dr. Coker thought that Shadrick was merely "working through an inflammatory problem." However, an x-ray taken in September 1990 revealed that one of the screws in Shadrick's back had broken on the same side he was having pain. Shadrick underwent surgery that same month to repair the broken screw. Dr. Coker believed that the broken screw was caused by Shadrick's repeated falls on his buttocks.

In November 1990, Shadrick again had surgery on his back. One of the purposes of this surgery was to remove the screws. Shadrick continued to have pain after this surgery. Dr. Coker discussed with Shadrick the possibility that his pain was due to scarring, about which little could be done.

Shadrick continued to complain of pain in his back following the removal of the screws. In March 1991, Dr. Coker and Shadrick discussed Dr. Coker's belief that Shadrick "appears ... not [to] tolerate pain well and there probably is significant evidence he has an emotional component to this [pain] problem." Dr. Coker subsequently referred Shadrick to a psychologist. In September 1991, Dr. Coker wrote a letter to Shadrick's attorney which reflected Dr. Coker's view that Shadrick's pain was psychosomatic because "he has unconsciously grasped the concept of having chronic pain and will not consciously dismiss that from his mind."[3]

For over three years following the removal of the screws, Shadrick continued to have pain in his back. Shadrick continued to see Dr. Coker for treatment. At no time did Dr. Coker attribute Shadrick's continued pain to the installation of the pedicle screws. Due to the severity of his back pain, Shadrick has been unable to work.

On December 17, 1993, Shadrick saw a television program (ABC's "20/20") in which a story was done on pedicle screws. It was from this program that Shadrick first learned that pedicle screws were experimental, that they had not been approved by the Food and Drug Administration for use in the spine, and that such screws had been found to cause a number of problems in patients. Until seeing the television program on December 17, 1993, Shadrick had been "led to believe that [he] had undergone a routine procedure and that everything would be all right." Shadrick testified that had he been informed about the true nature of pedicle implants he never would have elected to have surgery involving their use.

On December 16, 1994—approximately four years and nine months after the pedicle screws were implanted in his back—Shadrick filed this lawsuit against Dr. Coker and Centennial Medical Center.[4] The complaint alleged medical malpractice, lack of informed consent and battery. The complaint also alleged that Dr. Coker fraudulently concealed the "true facts concerning [his] actions and the true nature of the pedicle or back screws and related hardware." Shadrick claimed that prior to his surgery on March 12, 1990, he was not informed that pedicle screws would be placed in his spine. He stated in an affidavit that after the operation Dr. Coker informed him that screws had been used in the surgery, but that he was never led to believe that the screws were anything other than "routine treatment." According to Shadrick, Dr. Coker never told him that pedicle screws were experimental, that the screws had not been approved by the Food and Drug Administration for use in spinal sur-

---

**3.** The letter from Dr. Coker to Shadrick's attorney states in pertinent part: "I think to simplify what has happened, it might be reasonable to say that [Shadrick's] emotions have become imprinted with the pain that he initially experienced and his emotions have not let go of that pain even though his disk and nerve appear to have let go of it. This type of fixation is not unheard of but it certainly is a difficult situation to resolve. Obviously, [Shadrick] has had several surgical procedures, none of which have made him any better. The differential spinal test plus the psychological tests indicated that he has a fixation on the pain which is not supported by his physical findings. This does not imply in any way that [Shadrick] is mentally deranged, it only indicates that he has unconsciously grasped the concept of having chronic pain and will not consciously dismiss that from his mind."

**4.** The Shadricks voluntarily dismissed their appeal against Centennial Medical Center after this Court granted review. Thus, the only defendant before us is Dr. Coker.

gery, or that there were risks associated with their use in the spine. Ms. Shadrick sued for loss of consortium.

In response to the plaintiffs' complaint, Dr. Coker filed a motion for summary judgment. He asserted in the motion that the suit was barred by the three-year statute of repose and the one-year statute of limitations found in Tenn.Code Ann. § 29–26–116.

The plaintiffs, in turn, filed the affidavit of Raymond O. Frederick, M.D., who is a surgeon and an expert in back problems. According to Dr. Frederick, pedicle screws in 1990 were experimental in nature and had not been approved by the Food and Drug Administration for use in spinal surgery. Moreover, according to Dr. Frederick, the standard of care in 1990 required Dr. Coker to ensure that patients who were to receive pedicle screw implants were fully advised that those implants were not approved for use in the spine and to ensure that patients fully understood the risks. Dr. Frederick listed several specific items that should have been part of the informed consent obtained by Dr. Coker from Shadrick, such as informing him that pedicle screws were experimental as well as informing him of a list of possible complications and risks associated with their use.[5] Because Dr. Coker did not provide Shadrick with the information identified by Dr. Frederick as being required for informed consent, Dr. Frederick concluded that "to a reasonable degree of medical certainty, Dr. Coker ... violated the applicable standard of care with respect to informed consent."

Dr. Coker did not file an affidavit nor did he file any affidavits of experts in response to Dr. Frederick's affidavit submitted by Shadrick. Instead, Dr. Coker relied upon Shadrick's answers to discovery requests in arguing that Shadrick knew or reasonably should have known of his cause of action in 1990 because Shadrick was told soon after the March 12,1990 operation that the pedicle screws had been implanted in his back. Alternatively, Dr. Coker argued that Shadrick's cause of action was barred by the three-year statute of repose.

The trial court granted Dr. Coker's motion for summary judgment. The court found that Shadrick's suit was not saved by the discovery rule because he was told by Dr. Coker right after the surgery on March 12, 1990 that the screws had been implanted in his back, which was something Shadrick knew he had not authorized before the surgery. Further, Shadrick knew by November 1990 that one of the screws had broken and had to be replaced. Thus, he was placed on notice there was a problem with the screws. The trial court also rejected Shadrick's contention that the fraudulent concealment exception to the statute of repose applied because Dr. Coker made no affirmative concealment of the fact that the

5. According to Dr. Frederick, Shadrick should have been informed of the following: that the pedicle screws were not approved by the FDA; that the screws were experimental; that the screws might cause a fracture of bony structures in the spine; that the screws might cause bursitis to develop over the implants; that the screws might break or loosen; that the screws might cause delayed nerve root irritation or injury due to displaced or broken implant components; that the patient might experience bone resorption around the implants resulting in loosening or displacement of the device; that the implants might cause an allergic reaction to a foreign body due to metal sensitivity; that the patient might suffer pain, discomfort or abnormal sensations caused by the presence of the implants; that additional surgery might be required after normal healing has occurred to remove the implants; that the implants might cause irritation or discomfort; that the screws might cause prolonged illness, a draining wound, the need for blood transfusions, the need for further major surgery and/or permanent pain, deformity and inconvenience; that the screws might fail to achieve their objective and that the implants might in fact cause the patient's pain level and disability to become worse; that the patient might suffer possible local or systemic adverse reactions from any potential degradation products; that a mechanical grinding action could possibly occur that might generate wear debris; that the wear debris that might occur could cause local bone loss in articulating joints; that excessive or repeated stresses on the implants might cause them to break or loosen and cause the failure of the surgical procedure; that the patient was participating in a clinical investigation study; that the screws might cause dural leaks; that the implants might cause paralysis; that the screws might cause sensory loss; that the screws might cause loss of bowel or bladder control; that the implants might cause retrograde ejaculations or impotence; and that the screws might cause scarring of nerve roots.

screws had been implanted in Shadrick's back. The trial judge opined that "[h]ere there was no affirmative concealment and the facts were such that [Shadrick] knew or was on notice of inquiry that the implantation of the screws had been unsuccessful and possibly harmful. Even if the doctor .... should have told [Shadrick] more about the screws, such information does not change the fact that [Shadrick] knew or should have known in 1990 that there was a problem with the screws."

Shadrick appealed to the Court of Appeals. The Court of Appeals disagreed with the trial court's grant of summary judgment and reversed. The court found that there were disputed issues of material fact as to when Shadrick should have discovered his cause of action and whether there was fraudulent concealment on the part of Dr. Coker. The Court of Appeals reasoned that because there was a confidential relationship between Dr. Coker and Shadrick (i.e., doctor/patient), there was an issue of fact as to whether Dr. Coker's silence amounted to fraudulent concealment since Dr. Coker had a duty to inform Shadrick of the experimental status of the pedicle screws.

Thereafter, we granted review to determine whether the one-year statute of limitations or the three-year statute of repose for medical malpractice actions in Tenn.Code Ann. § 29–26–116 bar the Shadricks' suit against Dr. Coker. For the reasons that follow, we agree with the Court of Appeals that there are disputed issues of material fact as to when the statute of limitations began to run and whether the fraudulent concealment exception to the statute of repose applies.

### *ANALYSIS*

#### I.

■ The standards governing an appellate court's review of a motion for summary judgment are well settled. Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.03. Dr. Coker, as the party moving for summary judgment, has the burden of demonstrating that no genuine issue of material fact exists. *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993). We are to review the record before us without attaching any presumption of correctness to the trial court's judgment to determine whether the absence of genuine issues of material fact entitle Dr. Coker to judgment as a matter of law. *Robinson v. Omer,* 952 S.W.2d 423, 426 (Tenn.1997); *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn.1997). Further, we are required to view the evidence in the light most favorable to the nonmoving party, Shadrick, draw all reasonable inferences in his favor, and discard all countervailing evidence. *Byrd,* 847 S.W.2d at 210–11. If both the facts and conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion, summary judgment should be granted. *Robinson,* 952 S.W.2d at 426; *Bain,* 936 S.W.2d at 622; *McClung v. Delta Square Ltd. Partnership,* 937 S.W.2d 891, 894 (Tenn.1996)

#### II.

Shadrick's suit is based on the theory of lack of informed consent. He contends that Dr. Coker did not inform him prior to the surgery in March 1990 that the screws were going to be implanted in his back, much less that the screws were experimental in nature or that there were specific and material risks associated with their use. Therefore, Shadrick maintains he never consented to their use.

■ A cause of action based on the lack of informed consent stems from the premise that a competent patient should be allowed to formulate an intelligent, informed decision about surgical or other treatment procedures the patient undertakes. *Housh v. Morris,* 818 S.W.2d 39, 41 (Tenn.App.1991). The basic policy consideration which supports the recognition of the cause of action for lack of informed consent has been explained as follows:

> The root premise is the concept fundamental in American jurisprudence that 'every human being of adult years and sound mind has a right to determine what shall be done with his own body....' True consent to what happens to one's self is the informed exercise of a choice, and that

entails an opportunity to evaluate knowledgeably the options available and the risks dependant upon each. The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. From these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by [the] physician to [the] patient to make such a decision possible.

*Canterbury v. Spence,* 464 F.2d 772, 780 (D.C.Cir.1972).

■ Accordingly, the law recognizes that a health care provider, such as a physician or surgeon, who proposes a treatment or surgical procedure has a duty to provide the patient with enough information about the nature of the treatment or procedure involved to enable the patient to make an intelligent decision and thereby give an informed consent to the treatment or procedure. *See Cardwell v. Bechtol,* 724 S.W.2d 739, 750 (Tenn.1987). Depending on the usual and customary advice given to patients to procure consent in similar situations, the health care provider must typically inform the patient of the diagnosis or nature of the patient's ailment, the nature of and the reasons for the proposed treatment or procedure, the risks or dangers involved, and the prospects for success. *See* 70 C.J.S. *Physicians and Surgeons* § 93 (1987). The patient must also be informed of alternative methods of treatment, the risks and benefits of such treatment and, if applicable, that the proposed treatment or procedure is experimental. *Id.* Whether the information given to the patient is sufficient "depends on the nature of the treatment, the extent of the risks involved, and the standard of care [ap-

plicable to the defendant health care provider]." *Cardwell,* 724 S.W.2d at 749.[6]

■ When the health care provider performs the treatment or procedure without the requisite informed consent of the patient, liability attaches for the resulting injuries regardless of whether those injuries resulted from negligence. *Housh,* 818 S.W.2d at 42; *German,* 577 S.W.2d at 202; *Ray v. Scheibert,* 484 S.W.2d 63, 71 (Tenn.App.1972). This is because the doctrine of lack of informed consent is based upon the tort of battery, not negligence, since the treatment or procedure was performed without having first obtained the patient's informed consent. *Cardwell,* 724 S.W.2d at 751; *Cary v. Arrowsmith,* 777 S.W.2d 8, 21 (Tenn.App.1989). We have explained the relationship between lack of informed consent and battery as follows:

> [T]he failure to give such information [needed to obtain an informed consent] is not the type of omission that results in negligence, but rather it negates consent for the treatment. Without consent, the treatment constitutes a battery.
>
> [T]he correct analysis in our opinion is that if the evidence shows that the person had the capacity to consent, then the question becomes whether the consent given was effective because it was based upon adequate information on which to make the decision to submit to treatment; if not, then a battery results, but if so, then the question becomes whether the defendant subsequently did anything negligent in the administration of the treatment for which consent was obtained....
>
> These theories, battery and malpractice, are not ordinarily inconsistent, and no election of remedies is generally required; if a battery exists, then malpractice may not necessarily be reached, but if no battery

6. The burden of proof on the standard of care element is controlled by Tenn.Code Ann. § 29–26–118, which requires that in a lack of informed consent action the plaintiff prove, by expert testimony, "that the defendant did not supply appropriate information to the patient in obtaining his informed consent to the procedure out of which plaintiff's claim allegedly arose in accordance with the recognized standard of acceptable professional practice in the profession and in the speciality, if any, that the defendant practices in

the community in which he practices or in similar communities." *See also German v. Nichopoulos,* 577 S.W.2d 197, 204 (Tenn.App.1978) ("[I]n matters of informed consent the plaintiff has the burden of proving by expert medical evidence, (a) what a reasonable medical practitioner of the same or similar communities under the same or similar circumstances would have disclosed to the patient about the attendant risks incident to a proposed diagnosis or treatment and (b) that the defendant departed from the norm.").

can be shown, then the issue clearly emerges as one of malpractice. This distinction between battery and malpractice (as a form of negligence) is consistently recognized in the case law. *Cardwell*, 724 S.W.2d at 751.

■ This is not to suggest, however, that a health care provider is required to enumerate in detail every aspect of the proposed treatment or procedure or discuss every possible thing that might go wrong in an effort to obtain the patient's informed consent. "In the first place, to do so is humanly impossible. In the second place, if all the gory details of a proposed surgery were graphically explained to every patient and all possible medical maladies that might result were enumerated we doubt that a lay person would have the stomach to listen to it all; and if the patient did, would probably be in such a fearful state that no rational decision could be made." *Longmire v. Hoey*, 512 S.W.2d 307, 310 (Tenn.App.1974). Accordingly, health care providers are generally not required to disclose risks that are not material, such as those that are extremely unlikely to occur or one that a reasonable patient would not care to know due to its insignificance; risks that are obvious or already known by the patient; risks that are unforeseeable or unknowable; or where the patient's medical condition renders discussion of the risks and benefits of the treatment or procedure impossible or medically inadvisable, such as in an emergency where the patient is unconscious or otherwise incapable of consenting, or where full disclosure would be detrimental to the patient's total care, i.e., the patient is unduly alarmed or apprehensive to start with and additional information would overload the patient and jeopardize his or her physical or emotional well-being. *See Housh*, 818 S.W.2d at 42; *Longmire*, 512 S.W.2d at 310; *Ray*, 484 S.W.2d at 71; *Ball v. Mallinkrodt Chem. Works*, 53 Tenn.App. 218, 381 S.W.2d 563, 567 (1964); 70 C.J.S. *Physicians and Surgeons* § 94 (1987); Frantz, Annotation, *Modern Status of Views as to General Mea-*

*sure of Physician's Duty to Inform Patient of Risks of Proposed Treatment*, 88 A.L.R.3d 1008 (1978).

■ Causes of action based on lack of informed consent, like traditional medical malpractice cases involving negligence, are subject to the one-year statute of limitations and three-year statute of repose provided for in Tenn.Code Ann. § 29–26–116. The so-called discovery rule, which was first adopted in *Teeters v. Currey*, 518 S.W.2d 512 (Tenn. 1974),[7] was codified in 1975 as part of Tenn. Code Ann. § 29–26–116(a)(2). That statute provides that "[i]n the event the alleged injury is not discovered within the said one (1) year period, the period of limitation shall be one (1) year from the date of such discovery." This Court has interpreted Tenn.Code Ann. § 29–26–116(a)(2) to mean that the statute of limitations commences to run when the patient "discovered, or reasonably should have discovered, (1) the occasion, the manner, and the means by which a breach of duty occurred that produced [the patient's] injuries; and (2) the identity of the defendant who breached the duty." *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn.1997) (quoting *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982)).

■ The plaintiff may not, however, delay filing suit until all the injurious effects and consequences of the alleged wrong are actually known to the plaintiff. *Wyatt v. A–Best Company* 910 S.W.2d 851, 855 (Tenn. 1995). Similarly, the statute of limitations is not tolled until the plaintiff actually knows the "specific type of legal claim he or she has," *Stanbury*, at 672, or that "the injury constitute[d] a breach of the appropriate legal standard," *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn.1994). Rather, as we have recently emphasized, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant. *Stan-*

---

7. The creation of the discovery rule was necessary to "alleviate the intolerable result of barring a cause of action by holding that it 'accrued' before the discovery of the injury or the wrong." *Foster*, 633 S.W.2d at 305. Otherwise, a plaintiff would be required to sue to vindicate a wrong at a time when the injury was "unknown or unknowable." *Stanbury v. Bacardi*, 953 S.W.2d 671 (Tenn.1997).

*bury,* at 677; *see also Roe,* 875 S.W.2d at 657 ("[T]he plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct."). "It is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial." *Stanbury,* at 678. Such knowledge includes not only an awareness of the injury, but also the tortious origin or wrongful nature of that injury. *Hathaway v. Middle Tennessee Anesthesiology, P.C.,* 724 S.W.2d 355, 359 (Tenn.App.1986).

Applying these principles to the record before us, we cannot agree with Dr. Coker's insistence that the statute of limitations began to run as a matter of law in November 1990 (at the latest) when Shadrick had the surgery to remove the screws from his back. It is true, as pointed out by Dr. Coker, that Shadrick was told upon waking up from the surgery on March 12, 1990 that the screws were implanted in his back. This was something Shadrick knew he had not authorized before the surgery. Also, Shadrick knew he had received the surgical implants without being informed of any of the potential risks or complications associated with their use. Finally, he knew that one of the screws had broken—one of the unmentioned risks of the procedure—and had to have surgery in September 1990 to repair the broken screw.

However, we are not persuaded that these facts necessarily compel a reasonable person to conclude that Shadrick knew or reasonably should have known that his problems were the result of wrongful or tortious conduct on the part of Dr. Coker. Although Shadrick was told by Dr. Coker that the screws had been put in his back when he woke up from the March 12, 1990 surgery, he was also told at that time that the screws were "routine treatment" for the type of surgery he had undergone. The fact that Shadrick was informed that the screws had been put in his back after the surgery "did not mean anything to [him] because nobody ever told [him] about any risk of injury or any problems that could be caused by the screws. At the time, [he] had no idea that the screws were experimental, that they had not been approved by the Food and Drug Administration for use in the spine, or that they would cause [him] any problems." Indeed, it was not until December 17, 1993 while watching television that Shadrick learned that pedicle screws were experimental, that they had not been approved by the Food and Drug Administration for use in the spine, and that such screws had been found to cause a number of problems in patients. Until seeing the television program Shadrick had been "led to believe that [he] had undergone a routine procedure...." As a reasonable lay person, Shadrick could have believed Dr. Coker when he informed him that the screws were routine for use in back-fusion surgeries, especially since Dr. Coker had never disclosed any risks or potential complications related to the use of the screws or even their experimental nature.

Furthermore, it is significant that Dr. Coker offered a number of explanations for Shadrick's continuing back problems. Dr. Coker attributed the failure of the screw that broke to Shadrick's repeated falls on his buttocks. He attributed Shadrick's continuing pain to first an inflammatory problem, then to scarring about which little could be done, and then finally to Shadrick's psychological state. At no time did Dr. Coker attribute Shadrick's continuing problems to the installation of the pedicle screws. It was not until December 1993 that Shadrick realized that the pedicle screws were not "routine treatment" and that there were specific, material risks associated with their use. As Shadrick put it, "I did not know or suspect until December 17, 1993 that the implants placed in me by Dr. Coker ... were the cause of my problems."

Viewing this evidence in the light most favorable to Shadrick and allowing all reasonable inferences in his favor, we conclude that there is evidence in the record from which a jury could reasonably find that Shadrick was reasonably unaware of the wrongful or tortious origin of his injury until December 1993. Dr. Coker's argument that Shadrick was aware of his claim in 1990 rings hollow given that Shadrick was never informed of the risks involved in the installation of pedicle screws in his spine, was never

told that such medical devices were experimental, was told that the screws were "routine treatment," and was led to believe that his continuing difficulties were due to a number of problems, none of which were related to the implantation of the screws. Given these circumstances, a jury could find that Shadrick had no reason to suspect that he had sustained an injury resulting from Dr. Coker's wrongful or tortious conduct until December 1993. Dr. Coker has not met his burden of demonstrating that no genuine issue of material fact exists as to when the statute of limitations began to run.

### III.

Having decided that the one-year statute of limitations does not necessarily bar Shadrick's claim, we turn to whether there are disputed issues of material fact regarding fraudulent concealment on the part of Dr. Coker so as to avoid application of the three-year statute of repose.

Tenn.Code Ann. § 29–26–116(a)(3) provides that regardless of when a plaintiff discovers the cause of action, no cause of action may be brought after three years from the date of the alleged malpractice. Hence, the three-year statute of repose establishes a ceiling on the time in which a malpractice suit may be brought. The three-year limit is unrelated to the accrual of the cause of action, commencing not on discovery like the statute of limitations, but on the date of the alleged wrongful act. *Braden v. Yoder*, 592 S.W.2d 896, 897 (Tenn.App.1979). Nonetheless, the statute of repose may be tolled where there is "fraudulent concealment on the part of the defendant," in which case the cause of action must be brought within one year after discovering that the cause of action exists. Tenn.Code Ann. § 29–26–116(a)(3).

To establish fraudulent concealment, a plaintiff must prove (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so and, (2) the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence. *Stanbury*, S.W.2d at , n. 6; *Benton v. Snyder*, 825

S.W.2d 409, 414 (Tenn.1992). In this regard it has been observed that when there is a confidential or fiduciary relationship between the parties, the "failure to speak where there is a duty to speak is the equivalent of some positive act or artifice planned to prevent inquiry or escape investigation." *Hall v. De Saussure*, 41 Tenn.App. 572, 297 S.W.2d 81, 85 (1956). In our most recent case addressing the subject, we recognized that

the affirmative action on the part of the defendant must be something more than mere silence or a mere failure to disclose the known facts. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry, **or else there must be a duty resting on the party knowing such facts to disclose them. . . . For example, such a duty arises where a confidential relationship exists, as between physician and patient. In such cases, there is a duty to disclose, and that duty may render silence or failure to disclose known facts fraudulent.** This is the rule in Tennessee and in other jurisdictions.

*Benton*, 825 S.W.2d at 414 (emphasis in original) (citations omitted).

The third essential element of fraudulent concealment is knowledge on the part of the defendant of the facts giving rise to the cause of action. *Benton*, 825 S.W.2d at 414. In other words, the defendant must be aware of the wrong. *See Housh*, 818 S.W.2d at 43 ("Basically, fraudulent concealment will be shown where the physician had knowledge of the wrong done and concealed such information from the patient."); *Ray*, 484 S.W.2d at 72 ("Our Tennessee cases hold that knowledge on the part of the physician of the fact of a wrong done is an essential element of fraudulent concealment.").

The fourth and final essential element of fraudulent concealment is a concealment of material information from the plaintiff. *Benton*, 825 S.W.2d at 414. Concealment "may consist of withholding information or making use of some device to mislead" the plaintiff in order to exclude suspicion or prevent inquiry. *Id.* When there is a relationship involving trust and

confidence between the parties which would impose a duty to make a full disclosure of the material facts, mere silence or nondisclosure may constitute concealment. *See* 54 C.J.S. *Limitations of Actions* § 90 (1987). The rationale for this rule has been· explained as follows:

> Fiduciary relationship, confidential relationship, constructive fraud and fraudulent concealment are all parts of the same concept. [T]he nature of the relationship which creates a duty to disclose, and a breach of [that] duty constitutes constructive fraud or fraudulent concealment, springs from the confidence and trust reposed by one in another, who by reason of a specific skill, knowledge, training, judgment or expertise, is in a superior position to advise or act on behalf of the party bestowing trust and confidence in him. Once the relationship exists 'there exists a duty to speak ... [and] mere silence constitutes fraudulent concealment.'
>
> In the common knowledge of man, patients submit themselves to the skills and arts, proficiency and expertise, of hospital personnel, once they become confined to the hospital. Indeed, most frequently, they have no real choice in the matter; they are physically and intellectually unable to do much more than submit and rely upon the medical superiority and ethical propriety of their attendants.

*Garcia v. Presbyterian Hospital Ctr.,* 92 N.M. 652, 593 P.2d 487, 489—90 (1979) (citations omitted). *See also Lynch v. Waters,* 256 Ga. 389, 349 S.E.2d 456 (1986)("The physician-patient relationship is a confidential one and silence or failure to disclose what should be said or disclosed can. amount to fraud...."); *Leach v. Shapiro,* 13 Ohio App.3d 393, 469 N.E.2d 1047 (1984)("When the physician has knowledge of a fact concerning the patient's physical condition which is material to the patient, this fiduciary relationship may render the physician's silence fraudulent."); *Nixdorf v. Hicken,* 612 P.2d 348 (Utah 1980)("Where a physician has knowledge of a fact concerning the patient's physical condition which is material to that patient and he fails to disclose it, the confidence relationship between them creates a duty to disclose which may render his silence

fraudulent."); *Hardin v. Farris,* 87 N.M. 143, 530 P.2d 407 (1974)("Normally some positive act of concealment must be shown.... However, in a confidential relationship where there exists a duty to speak, such as in a doctor-patient relationship, mere silence constitutes fraudulent concealment.").

To summarize, a plaintiff in a lack of informed consent case (or any other medical malpractice case) attempting to toll the statute of repose contained in T.C.A. 29–26–116(a)(3) by relying upon the fraudulent concealment exception to the statute must establish that (1) the health care provider took affirmative action to conceal the wrongdoing or remained silent and failed to disclose material facts despite a duty to do so, (2) the plaintiff could not have discovered the wrong despite exercising reasonable care and diligence, (3) the health care provider knew of the facts giving rise to the cause of action and, (4) a concealment, which may consist of the defendant withholding material information, making use of some device to mislead the plaintiff, or simply remaining silent and failing to disclose material facts when there was a duty to speak.

Our review of the record before us demonstrates that there is evidence sufficient to create a jury issue on all the key elements of fraudulent concealment. The evidence from which the jury could infer concealment consisted of Dr. Coker's silence regarding the risks and complications associated with the use of pedicle screws in the spine and the failure to disclose their experimental nature. This is particularly true since Dr. Coker and Shadrick had a confidential or fiduciary relationship by virtue of having a doctor-patient relationship, which imposed a duty upon Dr. Coker to disclose material information. Furthermore, the jury could infer that Dr. Coker attempted to conceal material facts (i.e., the risks and potential complications and experimental nature of the procedure) associated with the wrong by offering various explanations for Shadrick's continuing problems, none of which had to do with the implantation of the screws. There was also the assurance by Dr. Coker to Shadrick that the screws were "routine treatment" for the type of surgery Shadrick had undergone. A jury

could thus find that throughout Dr. Coker's treatment of Shadrick Dr. Coker allayed any possible suspicions that Shadrick might have had concerning a claim against him by first representing that the screws were routine treatment and then later attributing the complications to several different causes, none of which related to the screws. Evidence of knowledge could also be inferred from this proof, particularly in light of Dr. Frederick's testimony that such information should have been discussed with Shadrick (but wasn't) in order to have obtained his informed consent and comply with the applicable standard of care.

Finally, we are also persuaded that, for the reasons discussed in the statute of limitations portion of this opinion, there is a question of fact regarding whether Shadrick could have discovered the wrong (failing to obtain his informed consent) through the exercise of reasonable care and diligence. We would only add that "[w]hether the plaintiff exercised reasonable care and diligence in discovering the injury or wrong is usually a question of fact for the jury to determine." *Wyatt*, 910 S.W.2d at 854.

It follows that, after taking the strongest legitimate view of Shadrick's evidence and allowing all reasonable inferences in his favor and discarding all countervailing evidence, more than one conclusion could be drawn from the evidence. Therefore, this is not an appropriate case for summary judgment.

### CONCLUSION

In view of the foregoing discussion, we conclude that disputed issues of material fact exist regarding when the statute of limitations began to run and whether the fraudulent concealment exception to the statute of repose applies. Accordingly, we affirm the reversal of summary judgment. Costs of this appeal are taxed to the defendant—appellant.

ANDERSON, C.J., REID, BIRCH and HOLDER, JJ., concur.