Almeda Zolia **GREEN**

v.

**Eugene I. SACKS.**

Court of Appeals of Tennessee, at Nashville.

March 15, 2001.

Permission to Appeal Denied by Supreme Court Sept. 17, 2001.

John D. Drake, Murfreesboro, TN, for appellant, Almeda Zolia Green.

Thomas Pinckney and Andy Rowlett, Nashville, TN, for appellee, Eugene I. Sacks.

## OPINION

KOCH, J., delivered the opinion of the court, in which CAIN, J. and TODD, Sp. J., joined.

This appeal involves a dispute between a patient and her physician regarding the surgical insertion of an Angelchik prosthesis to control a chronic gastric reflux condition. Almost five years after her surgery, the patient filed suit in the Circuit Court for Davidson County against her physician and the Angelchik's manufacturer. The case was removed to federal court, but the federal proceedings were eventually dismissed after the patient voluntarily dismissed her claims against the manufacturer. After the case was returned to the trial court, the physician moved for a summary judgment on the ground that the patient's claim was barred by the statute of repose in Tenn.Code Ann. § 29–26–116(a)(3) (2000) and the statute of limitations in Tenn.Code Ann. § 29–26–116(a)(1), (2). The patient responded that her physician's fraudulent concealment tolled the running of the statute of repose and that she filed suit within one year of discovering her injury. The trial court granted the physician's summary judgment motion. The patient asserts on this appeal that the physician has not demonstrated that he is entitled to a judgment as a matter of law on either defense. We agree. There is a material factual dispute regarding whether the physician's failure to inform his patient of the manner in which he inserted the Angelchik device amounts to fraudulent concealment for the purpose of tolling the statute of repose. Likewise, the patient demonstrated that she filed suit within one year after discovering her injury. Accordingly, we reverse the summary judgment.

Almeda Green is in her seventies and lives in Rutherford County. She had experienced stomach problems for a number of years, including reflux esophagitis, a painful condition that allows gastric fluid from her stomach to enter her esophagus. As a result of these problems, she has undergone multiple surgeries on and around her stomach. One of these surgeries, performed in 1980, involved wrapping part of her stomach tissue around the bottom of her esophagus. This procedure left her stomach tubular shaped.

In early 1987, Ms. Green consulted Eugene I. Sacks, a general surgeon practicing in Nashville, because she was continuing to experience discomfort from reflux esophagitis. Dr. Sacks treated Ms. Green conservatively with medication for approximately eighteen months. In June 1988, when it became evident that the medication was not alleviating Ms. Green's discomfort, Dr. Sacks broached the possibility of surgery. Ms. Green was reluctant to have further surgery in light of the previous surgeries that had not alleviated her problem.

Ensuing events eroded Ms. Green's reluctance about further surgery. In August 1997, she was taken to the emergency room of the Smyrna Medical Center with upper gastrointestinal bleeding. Based on Ms. Green's persisting symptoms, the long and complicated history of her gastrointestinal problems, and the failure of more conservative treatment, Dr. Sacks recommended the surgical insertion of an Angelchik prosthesis. An Angelchik prosthesis is a doughnut-shaped device containing silicone gel that is wrapped around the esophagus at the gastroesophageal junc-

tion (where the stomach and esophagus meet) for the purpose of limiting gastric reflux into the esophagus.[1] After insertion, the device rests on the upper part of the stomach where the stomach becomes wider than the device's inner circumference. Ms. Green consented to the surgery because she was concerned that her condition seemed to be getting worse.

Dr. Sacks operated on Ms. Green on September 8, 1988, at Southern Hills Medical Center in Nashville. During the procedure, Dr. Sacks determined that the configuration of Ms. Green's alimentary canal required him to vary the procedure he had planned to perform. As Dr. Sacks describes it: "Because earlier operations had made the top part of Ms. Green's stomach somewhat tubular in shape and indistinguishable from the lower part of the esophagus, I placed the Angelchik below her gastroesophageal junction, allowing it to rest on the part of her stomach that is wider than the inner circumference of the device. The device could not be placed at a higher position." Dr. Sacks never informed Ms. Green that he had placed the Angelchik around her stomach rather than at the gastroesophageal junction.

On September 19, 1988, while Ms. Green was recuperating from surgery, Dr. Sacks conducted an x-ray study revealing that Ms. Green had some continuing reflux above the Angelchik prosthesis. The study also confirmed that the Angelchik was around Ms. Green's stomach below the gastroesophageal junction. At this point, Dr. Sacks decided that it was best, in his words, to "leave the prosthesis in place . . . and see how she did." He discharged Ms.

Green from the hospital without informing her about the location of the Angelchik.

Dr. Sacks continued to follow Ms. Green postoperatively until November 1991. He continued to monitor the Angelchik's location with x-rays in May 1989 and September 1990. During this time, Ms. Green's reflux problems remained essentially unchanged. In November 1991, Dr. Sacks referred Ms. Green to another physician for continuing treatment.

Ms. Green was taken to Vanderbilt University Medical Center in June 1992 after she passed out. An upper GI endoscopy and an upper GI series revealed that the Angelchik prosthesis had partially eroded into Ms. Green's stomach.[2] The Vanderbilt physician treating Ms. Green referred her back to Dr. Sacks. Dr. Sacks determined that the prosthesis should be removed but referred Ms. Green to another surgeon because he was in the process of closing his medical practice. In mid-July 1992 Ms. Green underwent surgery to remove the Angelchik.

On May 28, 1993, Ms. Green filed a medical malpractice action against Dr. Sacks in the Circuit Court for Davidson County. She also asserted a products liability claim against Mentor Corporation, the Angelchik's manufacturer. Dr. Sacks and Mentor jointly removed the suit to the United States District Court for the Middle District of Tennessee on the ground that Ms. Green's claims against Mentor were pre-empted by the federal Food, Drug, and Cosmetic Act. Shortly after removal, Ms. Green voluntarily dismissed her claim against Mentor, leaving only the medical malpractice action against Dr. Sacks. Dr. Sacks obtained summary judg-

---

1. *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180, 182 (D.Ariz.1999) (containing a more detailed description of the Angelchik device).

2. It is apparently not uncommon for an Angelchik to erode or migrate. *See, e.g., Gebhardt v. Mentor Corp.*, 191 F.R.D. at 184–85; *Montoya v. Mentor Corp.*, 122 N.M. 2, 919 P.2d 410, 411 (Ct.App.1996).

ment on that claim in the United States District Court, but in August 1996, the United States Court of Appeals for the Sixth Circuit vacated the district court's judgment and dismissed the entire case for lack of subject matter jurisdiction.[3] Thereafter, the case was returned to the trial court for further proceedings.

After the case returned to the trial court, Dr. Sacks renewed his motion for summary judgment on the ground that Ms. Green's medical malpractice claim was barred by the statute of limitations in Tenn.Code Ann. § 29–26–116(a)(1), (2) and by the statute of repose in Tenn.Code Ann. § 29–26–116(a)(3). Ms. Green responded to the motion by asserting that the statute of repose should be tolled because Dr. Sacks had fraudulently concealed the details of the Angelchik procedure from her, and that she had filed her suit within one year after discovering her injury. The trial court disagreed and granted Dr. Sacks's summary judgment motion, expressly adopting the reasoning in the United States District Court's earlier order granting Dr. Sacks a summary judgment. On this appeal, Ms. Green asserts that Dr. Sacks was not entitled to a judgment as a matter of law.

## I.

### APPELLATE REVIEW OF SUMMARY JUDGMENTS

The standards for reviewing summary judgments on appeal are well-settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn.1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn.R.Civ.P. 56.04. Thus, a summary judgment should be granted only

when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion—that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn.2000); *White v. Lawrence*, 975 S.W.2d 525, 529–30 (Tenn.1998); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997).

Summary judgments enjoy no presumption of correctness on appeal. *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn.2000); *Nelson v. Martin*, 958 S.W.2d 643, 646 (Tenn.1997). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R.Civ.P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50–51 (Tenn.1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn.1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Terry v. Niblack*, 979 S.W.2d 583, 585 (Tenn.1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn.1997); *Baltrip v. Norris*, 23 S.W.3d 336, 340 (Tenn.Ct.App. 2000). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct.App.1998).

## II.

### THE MEDICAL MALPRACTICE STATUTE OF REPOSE

Ms. Green asserts that the trial court erred by granting Dr. Sacks's motion for

---

**3.** *Green v. Sacks*, 92 F.3d 1185 (table), 1996    WL 437927 (6th Cir. Aug.2, 1996).

summary judgment because she presented "sufficient evidence [of] ... fraudulent conduct" to toll the running of the statute of repose in Tenn.Code Ann. § 29–26–116(a)(3). While we do not find any evidence of fraudulent conduct on the part of Dr. Sacks, we have determined that he is not entitled to a summary judgment because Ms. Green's evidence creates a jury question regarding whether he should have advised Ms. Green postoperatively of the unanticipated placement of the Angelchik.

## A.

Ever since the enactment of the Medical Malpractice Review Board and Claims Act in 1975,[4] all medical malpractice claims have been governed by a one-year statute of limitations[5] and a three-year statute of repose. With regard to the statute of repose, Tenn.Code Ann. § 29–26–116(a)(3) states:

In no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after discovery that the cause of action exists.

The purpose of this provision is to address the perceived medical malpractice insurance crisis by placing an absolute three-year limit upon the time within which a medical malpractice action may be brought. *Cronin v. Howe*, 906 S.W.2d 910, 913 (Tenn.1995); *Harrison v. Schrader*, 569 S.W.2d 822, 826 (Tenn.1978).

The statute of repose begins to run from the date the allegedly negligent act or omission occurred. The running of

the time within which a suit must be filed cannot be tolled except as provided in the statute itself or in another statute that specifically references the particular statute of repose. *Penley v. Honda Motor Co.*, 31 S.W.3d at 184–85. The only current statutory basis for tolling Tenn.Code Ann. § 29–26–116(a)(3)'s three-year statute of repose is "fraudulent concealment on the part of the defendant." Once a defendant makes out a prima facie defense that the three-year period in Tenn.Code Ann. § 29–26–116(a)(3) has elapsed, the burden of proof shifts to the plaintiff to demonstrate that he or she is entitled to take advantage of the statute's tolling provision. *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn.1992).

The courts' understanding of the sorts of conduct that amount to "fraudulent concealment" for the purpose of tolling the running of a statute of limitations or a statute of repose has evolved over time. For many years, the courts permitted "fraudulent concealment" tolling only when the physician had actual knowledge of the wrong done and concealed it from the patient. *Housh v. Morris*, 818 S.W.2d 39, 43 (Tenn.Ct.App.1991); *Ray v. Scheibert*, 484 S.W.2d 63, 72 (Tenn.Ct.App.1972); *Clinard v. Pennington*, 59 Tenn.App. 128, 139, 438 S.W.2d 748, 753 (1968). In 1992, the Tennessee Supreme Court signaled that "fraudulent concealment" included more than concealing that a wrong had been done. Invoking the confidential nature of the relationship between a physician and his or her patient, the Court held that "fraudulent concealment" could also occur when the physician fails to disclose information that he or she has a duty to disclose. *Benton v. Snyder*, 825 S.W.2d at 414. While the court did not directly de-

---

4. Act of May 21, 1975, ch. 299, 1975 Tenn. Pub. Acts 662.

5. Tenn.Code Ann. § 29–26–116(a)(2).

scribe the type of information that physicians were expected to disclose, it stated that "[k]nowledge on the part of the physician of the facts giving rise to a cause of action is an essential element of fraudulent concealment." *Benton v. Snyder*, 825 S.W.2d at 414.

In 1998, the Tennessee Supreme Court returned to the question of the elements of the "fraudulent concealment" exception to the medical malpractice statute of repose. The court stated that in all medical malpractice cases, persons desiring to rely upon the fraudulent concealment exception to Tenn.Code Ann. § 29–26–116(a)(3) must establish that "(1) the health care provider took affirmative action to conceal the wrongdoing or remained silent and failed to disclose material facts despite a duty to do so, (2) the plaintiff could not have discovered the wrong despite exercising reasonable care and diligence, (3) the health care provider knew of the facts giving rise to the cause of action, and (4) a concealment, which may consist of the defendant withholding material information, making use of some device to mislead the plaintiff, or simply remaining silent and failing to disclose material facts where there was a duty to speak." *Shadrick v. Coker*, 963 S.W.2d 726, 736 (Tenn.1998).

**B.**

■ There is no reasonable dispute that Ms. Green could not have discovered the information regarding the placement of the Angelchik on her own without being told by Dr. Sacks or another physician. It is also undisputed that Dr. Sacks knew where he had placed the Angelchik and that he never informed Ms. Green about where he had placed the device or why he had placed it in that location. Thus, the dispositive question in this case is whether Dr. Sacks affirmatively acted to conceal wrongdoing or failed to disclose material facts to Ms. Green despite a duty to do so.

For the purposes of this opinion, we readily concede that there is no evidence in the record that Dr. Sacks knew or suspected that he might have made a mistake when he placed the Angelchik prosthesis around Ms. Green's stomach. Thus, to create a jury issue regarding "fraudulent concealment," Ms. Green must demonstrate that she will be able to prove that Dr. Sacks had a duty to inform Ms. Green, following the surgery, that he had placed the Angelchik around her stomach rather than at the gastroesophageal junction. Conversely, to be entitled to a summary judgment, Dr. Sacks must demonstrate that Ms. Green will be unable to establish this essential element of her case and, therefore, that he is entitled to a judgment as a matter of law.

■ Whether a particular defendant owes a duty of care to a particular plaintiff is a question that must be decided by the court as a matter of law. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d at 89; *Rice v. Sabir*, 979 S.W.2d 305, 309 (Tenn.1998); *Dillard v. Vanderbilt University*, 970 S.W.2d 958, 960 (Tenn.Ct.App.1998). Physicians have a confidential relationship with their patients. Because of the trust that patients repose in their physicians, patients rely implicitly, not only on what their physicians tell them, but also on their belief that their physicians will not leave anything of importance unsaid. Accordingly, the Tennessee Supreme Court has determined that physicians have a heightened duty to disclose material medical facts to their patients. *Shadrick v. Coker*, 963 S.W.2d at 735; *Benton v. Snyder*, 825 S.W.2d at 414. The questions that remain to be answered are (1) what sorts of facts should be deemed to be material enough to require disclosure and (2) how should the question of materiality be decided.

The sorts of facts that require disclosure to a patient involve matters that are not already known by the patient or that are not within the realm of common experience. To be material, these facts must involve the patient's medical condition and must consist of the sort of information that a reasonable person in the patient's position would want to know in order to understand and to make decisions regarding medical matters. *Arato v. Avedon,* 11 Cal.Rptr.2d 169, 175–76 (Ct.App. 1992); *Nixdorf v. Hicken,* 612 P.2d 348, 354 (Utah 1980); *Brown v. Dibbell,* 227 Wis.2d 28, 595 N.W.2d 358, 366 (1999); Marjorie M. Schultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 Yale L.J. 219, 283–84 (1985).

It is neither improper nor altogether uncommon to vary a procedure in some substantial way from that discussed with the patient beforehand during the consent process. A number of courts, including this court, have held that in this circumstance, a physician has a duty to inform the patient that he or she varied the procedure and that the failure to provide this information was sufficient to create a jury issue on fraudulent concealment. *Hall v. DeSaussure,* 41 Tenn.App. 572, 582–83, 297 S.W.2d 81, 86 (1956); *see also Roberts v. Francis,* 128 F.3d 647, 649 (8th Cir. 1997); *Hershley v. Brown,* 655 S.W.2d 671, 677 (Mo.Ct.App.1983). Conversely, other courts have held that there is no fraudulent concealment when a physician informs a patient postoperatively that he varied the procedure. *Wheeler v. Schmid Labs., Inc.,* 451 N.W.2d 133, 139 (N.D.1990).

That leaves for determination how should the question about whether particular information is material be decided. Decisions regarding the scope and parameters of a physician's duty to disclose material information must be guided, at least in part, by the medical profession. For a physician's failure to disclose information to constitute fraudulent concealment for the purpose of tolling the statute of repose, the failure to disclose should also be, in the words of Tenn.Code Ann. § 29–26–115(a)(1), below the "recognized standard of acceptable professional practice in the profession and specialty thereof." Making this determination calls for expert medical testimony consistent with Tenn.Code Ann. § 29–26–115(b).

A relatively recent case involving the use of teflon pledgets to support lung sutures makes this point. A surgeon used teflon pledgets to support his sutures following the removal of his patient's right lung but did not tell the patient after the surgery that he had used these pledgets. When the patient died nine years later from respiratory insufficiency caused, in part, by the teflon pledgets, her estate filed a medical malpractice action against the physician. When the physician asserted that the suit was barred by the statute of repose in Tenn.Code Ann. § 29–26–116(a)(3), the estate responded that the physician had fraudulently concealed the cause of action by failing to inform his patient that he had used the teflon pledgets. In affirming the summary judgment for the physician, this court pointed to the surgeon's uncontradicted testimony "that it was not the standard of care in the community to discuss with a patient after surgery a particular instrument or device used in surgery, like pledgets." *Burris v. Ikard,* 798 S.W.2d 246, 249 (Tenn.Ct.App. 1990). Had the surgeon's opinion regarding his postoperative disclosures to his patient been contradicted by opposing expert testimony, the summary judgment would not have been warranted.

## C.

Keeping in mind the pivotal role of expert testimony in establishing the scope

of a physician's duty, we must examine the record to determine whether it contains competent evidence regarding Dr. Sacks's duty to inform Ms. Green about the placement of the Angelchik prosthesis. Dr. Sacks testified in his February 4, 1994 deposition that he did not inform Ms. Green postoperatively about his decision to place the Angelchik below the gastroesophageal junction. He explained:

I don't think Ms. Green would have had the vaguest idea what I was talking about if I even tried to explain that to her, and ... had I done that, I think it would have created further problems for Mrs. Green in terms of her trying to understand what I was saying and misconstruing what I was saying. So I felt that in the best interests of my patient and in my relationship with my patient it was best not to advise her of anything because I had no plans at that time to do anything differently.

He also explained that he did not inform any of Ms. Green's family members about the procedure because he did not see any of them after the procedure and because Ms. Green had not authorized him to discuss her medical condition with anyone else. In a May 16, 1994 affidavit, Dr. Sacks also asserted that "[a]t all times in my care and treatment of Ms. Green, I conformed to the recognized standard of acceptable surgical practice in this community." Reading these statements together, Dr. Sacks testified that he did not owe a duty to Ms. Green to inform her postoperatively that he had placed the Angelchik prosthesis below the gastroesophageal junction, a location different from the location he had discussed with her when he had obtained her consent to perform the surgery.

To oppose Dr. Sacks's summary judgment motion, Ms. Green presented the testimony of Martin T. Evans, a practicing surgeon from Virginia who was clearly qualified to give an expert opinion pursuant to Tenn.Code Ann. § 29–26–115(b). Dr. Evans was extremely critical of the Angelchik prosthesis, stating that "[t]he majority of surgeons avoided the use of this device altogether due to the extreme complications associated with its use that had been documented in medical journals and periodicals prior to September 1988." He also stated that "I cannot find any basis to justify placement of an Angelchik device around the mid-portion of the stomach." Turning to Dr. Sacks's obligation to inform Ms. Green about the actual placement of the Angelchik prosthesis, Dr. Evans testified that "Dr. Sacks had a medical obligation to inform the patient of this improper placement and obtain consent for the continued application of the device in its then location." Dr. Evans also testified that "[b]y failing to inform Mrs. Green that the device was inserted in the improper location, Dr. Sacks deviated from the generally medically accepted standards for proper disclosure of risks associated with medical care."

Dr. Sacks's testimony and Dr. Evan's testimony regarding Dr. Sacks's duty to inform Ms. Green about the placement of the Angelchik prosthesis is diametrically opposed. A summary judgment should not be granted when there exists a genuine dispute regarding the material facts. Dr. Sacks's decision to place the Angelchik around Ms. Green's stomach rather than at the gastroesophageal junction was more than a "gory detail"[6] or matter of technique[7] because it arguably affected the

---

**6.** *Longmire v. Hoey,* 512 S.W.2d 307, 310 (Tenn.Ct.App.1974)

**7.** In a case involving a surgeon's decision to use teflon pledgets to support the sutures used to close a lung, the surgeon testified without

Angelchik's efficacy to stop the reflux that was causing Ms. Green such discomfort. Thus, the trial court should not have granted Dr. Sacks a summary judgment based on his statute of repose defense. The conflict between the testimony of Dr. Sacks and Dr. Evans with regard to Dr. Sacks's obligation to inform Ms. Green about the actual placement of the Angelchik prosthesis created a jury question on the "fraudulent concealment" exception to the statute of repose.

## III.

### DR. SACKS'S STATUTE OF LIMITATIONS DEFENSE

Ms. Green also asserts that the trial court erred by concluding that her claim against Dr. Sacks is time-barred under the one-year statute of limitations in Tenn. Code Ann. § 29–26–116(a)(1), (2). She insists that her suit was timely because it was filed within one year after she discovered that she had suffered an injury as a result of Dr. Sacks's wrongful conduct. We agree.

### A.

■ In 1974, the Tennessee Supreme Court adopted the discovery rule for determining when the statute of limitations begins to run in medical malpractice actions. *Teeters v. Currey,* 518 S.W.2d 512, 515 (Tenn.1974). The Tennessee General Assembly later codified the discovery rule in the Medical Malpractice Review Board and Claims Act in 1975, and the rule can now be found in Tenn.Code Ann. § 29–26–116(a)(2). The purpose of the rule is to "alleviate the intolerable result" of barring a patient's medical malpractice claim before the patient knows or should have

known that the claim exists. *Foster v. Harris,* 633 S.W.2d 304, 305 (Tenn.1982).

■ Under the discovery rule, the medical malpractice statute of limitations begins to run when the patient discovers, or reasonably should have discovered (1) the occasion, the manner, and the means by which a breach of duty that caused his or her injuries occurred and (2) the identity of the person who caused the injury. *Stanbury v. Bacardi,* 953 S.W.2d 671, 677 (Tenn.1997); *Roe v. Jefferson,* 875 S.W.2d 653, 656 (Tenn.1994); *Foster v. Harris,* 633 S.W.2d at 305. However, the discovery rule does not permit a patient to delay filing suit until he or she becomes aware of all the injurious consequences of the alleged negligence. *Shadrick v. Coker,* 963 S.W.2d at 733. Thus, the statute of limitations will begin running when the patient becomes aware of facts that would put a reasonable person on notice that he or she has sustained an injury as a result of a tortious act of a health care provider. *Shadrick v. Coker,* 963 S.W.2d at 733–34; *Roe v. Jefferson,* 875 S.W.2d at 657; *Hathaway v. Middle Tenn. Anesthesiology, P.C.,* 724 S.W.2d 355, 359 (Tenn.Ct.App. 1986).

### B.

■ Dr. Sacks's statute of limitations argument is not without some irony. On one hand, he asserts that his treatment of Ms. Green was consistent with the "recognized standard of acceptable surgical practice in this community." On the other hand, he asserts that Ms. Green, whom he describes as "of limited intelligence ... often ... unable to make associations," should have known or suspected "within two or three days after the surgery" that he had done something wrong. He bases

---

contradiction that the standard of care did not require him to discuss with the patient following surgery the instruments or devices

used in the procedure. *Burris v. Ikard,* 798 S.W.2d at 249.

this argument on Ms. Green's state of mind following the surgery. Specifically, Ms. Green explained in her deposition that "I kn[e]w there was something, you know, unusual, that didn't feel right, but that's all I can explain, you know." While she attributed her discomfort to the surgery, she added, "I didn't have the knowledge what was going on. I knew I was sick." Ms. Green complained to Dr. Sacks "several times [that] something [is] wrong here, I don't feel right." These statements prompted Dr. Sacks to assure Ms. Green that she would be "all right in a few days." According to Ms. Green, the "few days" lasted almost one month, but she eventually began to feel better.

Ms. Green's complaints of postoperative pain are not evidence that she knew that she had been injured or that she knew of the tortious origin of her injury. She knew that Dr. Sacks had implanted the Angelchik prosthesis in her abdomen but she could not see or feel precisely where it was located in her body. She did not correlate the location of the Angelchik to her discomfort but rather explained that she felt like she was "choking" and "almost busting" inside. For all she knew, this discomfort was part of her body's adjustment to the presence of a foreign object. She had no reason to be alarmed or suspicious, especially when Dr. Sacks assured her that her pain would eventually subside and when her postoperative pain eventually did decrease. Thus, unlike the patient in *Stanbury v. Bacardi* who could plainly see the botched surgery on her feet soon after surgery, Ms. Green had no factual basis, two or three days following her surgery, for knowing or discovering that Dr. Sacks had inserted the Angelchik prosthesis in a negligent manner.

Receiving advice from another health care professional is not the only way for a patient to discover that he or she has been injured. *Stanbury v. Bacardi,* 953 S.W.2d at 678. For discovery to take place, it is only necessary that the patient become aware of facts that would lead a reasonable person to grasp the manner and means by which the injury occurred. Merely experiencing pain and sickness following surgery does not necessarily signal that an injury has occurred or the manner or means by which the injury was caused. We find that Ms. Green did not reasonably discover the manner and means of her injury until June 1992 when the physicians at Vanderbilt University Medical Center told her that the Angelchik was around her stomach, not at the gastroesophageal junction. Accordingly, by the express terms of Tenn.Code Ann. § 29–26–116(a)(3), Ms. Green's May 1993 medical malpractice complaint was timely filed.

### IV.

We reverse the summary judgment and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Eugene I. Sacks for which execution, if necessary, may issue.