IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 7, 2005 Session

## EMERSON E. RUSSELL, ET AL. v. TED W. BROWN, JR., M.D., ET AL.

### Appeal from the Circuit Court for Hamilton County
No. 98-C-1121     Samuel H. Payne, Judge

No. E2004-01855-COA-R3-CV  - FILED AUGUST 18, 2005

Emerson E. Russell ("the plaintiff") and his wife, Angie Russell, brought this suit for medical malpractice against Dr. Ted W. Brown, Jr., seeking damages associated with injuries allegedly suffered by the plaintiff as a result of a surgical procedure performed by Dr. Brown. The plaintiff also named as a defendant Dr. S. Morgan Smith, the anesthesiologist who attended the plaintiff's surgery. In the complaint, the plaintiff averred, among other allegations, that he was not adequately informed of alternative treatments for his snoring problem, and that he was not fully advised of the attendant risks of the procedure performed by Dr. Brown. A jury returned a verdict for the defendants. Following the trial, the defendants filed separate motions for discretionary costs, which motions were granted in part and denied in part. The plaintiff and his wife appeal, arguing that the plaintiff was not furnished sufficient information to enable him to give "informed" consent to the surgery performed by Dr. Brown. They also contend that the trial court's charge to the jury on the issue of informed consent did not adequately instruct the jury on the subject. Finally, they raise several issues pertaining to evidentiary matters. As a separate issue, the defendants contend that the trial court's awards of discretionary costs were inadequate. We affirm the judgment of the trial court with respect to the jury's verdict. We modify the trial court's two awards of discretionary costs. As modified, those awards are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed as Modified; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

William T. Alt, Chattanooga, Tennessee, for the appellants, Emerson E. Russell and wife, Angie Russell.

James D. Robinson and Steven M. Roderick, Chattanooga, Tennessee, for the appellees, Ted W. Brown, Jr., M.D., and Chattanooga Ear, Nose & Throat Associates, P.C.

Jennifer H. Lawrence, Chattanooga, Tennessee, for the appellees, S. Morgan Smith, M.D., and Anesthesiology Consultants Exchange, Inc.

**OPINION**

I.

On March 19, 1996, the plaintiff, a 49-year-old man, went to see Dr. Brown, a board-certified otolarynologist and a member of Chattanooga Ear, Nose & Throat Associates, P.C., also a named defendant in this action. The plaintiff had seen Dr. Brown five years earlier, at which time Dr. Brown had removed a benign tumor from the plaintiff's neck. On the occasion of the 1996 visit, the plaintiff's primary complaint was a chronic sore throat, which he attributed to the fact that he was a frequent traveler. Dr. Brown diagnosed the plaintiff's condition as recurrent tonsilitis, and suggested that he undergo a tonsillectomy. The plaintiff inquired about the risks associated with this surgery, as his 21-year-old daughter had recently undergone the same procedure. Dr. Brown responded to his questions.

As Dr. Brown was leaving the office, the plaintiff asked if the surgery would have a beneficial effect on his snoring. Dr. Brown returned to conduct a second physical exam and discovered that the point of obstruction was in the plaintiff's palate, tonsils and deviated septum. He diagnosed the plaintiff with a condition of mild sleep apnea. Dr. Brown testified at trial that he believed the plaintiff's sleep apnea was medically insignificant. The latter diagnosis did not alter Dr. Brown's treatment plan, *i.e.* to perform a tonsillectomy. He also testified that he informed the plaintiff that he would trim the uvula and a small portion of the palate. The plaintiff, however, recalled only that Dr. Brown told him that the surgery would involve the "trimming of the uvula." Dr. Brown's office notes from that visit indicate the following: "surgery discussed, risks and complications, schedule tonsillectomy, septoplasty, [uvulopharyngoplasty]."[1]

Dr. Brown does not dispute the plaintiff's testimony that the doctor did not advise him of non-surgical alternatives to remedy his snoring. One such alternative included a CPAP machine, which is a device that requires the patient to wear a mask strapped around the patient's head, through which humidified, warm air passes. A second alternative, the laser assisted uvuloplatoplasty, or LAUP, is a laser procedure. Dr. Brown testified that only one of twelve otolaryngologists in the Chattanooga area had the laser unit required to perform a LAUP. Dr. Brown also mentioned in his

---

[1]There are two procedures discussed throughout this opinion. A uvulopharyngoplasty, or UVPP, is a procedure that involves trimming the uvula and the palate. This is the procedure indicated in the office notes. The procedure actually performed, however, was a uvulopalatopharyngoplasty, or UPPP, which involves not only trimming the uvula and the palate, but also removing a portion of the pharyangeal wall.

testimony a third option – a dental appliance – but noted that such devices are uncomfortable and that patients tend not to wear them.[2]

Dr. Smith is an anesthesiologist with the defendant Anesthesiology Consultants Exchange, Inc.  On April 1, 1996, Dr. Smith conducted a pre-anesthetic evaluation of the plaintiff.

The plaintiff's surgery was scheduled for April 4, 1996.  On that date, the plaintiff signed a consent form which provided, in pertinent part, as follows:

> I, the undersigned, a patient in Erlanger East Hospital, hereby authorize Dr. Brown (and whomever he may designate as his assistants) to administer such treatment as is necessary, and to perform the following operation [s]eptoplasty, tonsillectomy, UVPP and such additional operations or procedures as are considered therapeutically necessary on the basis of findings during the course of said operation.
>
> *   *   *
>
> I hereby certify that I have read and fully understand the above Authorization for Surgeon to Operate, the reasons why the above-named surgery is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by Dr. Brown.  I also certify that no guarantee or assurance has been made as to the results that may be obtained.

The consent form was signed by the plaintiff, and witnessed by a nurse.

The plaintiff's admission report indicates that the plaintiff had a history of recurrent tonsillitis, obstructive sleep apnea, and chronic nasal obstruction.  As to his condition, the report states that the plaintiff

> has very loud snoring with witnessed apneic spells per the wife.  He is tired.  Suffers from daytime somnolence and easy fatiguability.  He mouth breaths frequently because of chronic nasal obstruction.  He is admitted now for septoplasty, tonsillectomy, [UPPP].

---

[2]Another option is to instruct the patient to change positions, *i.e.,* by sewing a tennis ball in the patient's nightshirt so as to prevent sleeping on one's back.  It is undisputed that the plaintiff had already attempted this solution.

The post-operative report pertaining to the plaintiff indicates that the following surgeries were performed: tonsillectomy, septoplasty, and a UPPP. It further indicates that the surgery was uneventful.

Following a period of time in the recovery room, the plaintiff was moved to a private room. At that point, his wife joined him. Mrs. Russell testified that her husband expressed to her that he "didn't feel right." She asked if her husband could stay at the hospital overnight, and Dr. Brown approved her request. The plaintiff was discharged the following day.

The plaintiff's first post-operative visit to Dr. Brown's office was on April 12, 1996. On that date, the plaintiff complained that his throat was sore and that he had difficulty speaking. Dr. Brown conducted a physical exam, but did not observe any neurological impairment. At the same time, Mrs. Russell indicated to Dr. Brown that she had not seen any significant improvement in her husband's condition. Dr. Brown attributed this to his age; he believed that his symptoms were consistent with the type of surgery the plaintiff had undergone.

The plaintiff was subsequently seen on April 19, 1996. The office notes for that day indicate that the plaintiff reported he was "feeling better." According to the office record, his throat appeared to be healing well.

On April 25, 1996, the Russells had a party for the plaintiff's business associates. Many people expressed to Mrs. Russell their concern regarding the plaintiff's condition. As a result, on April 26, 1996, the plaintiff went to see Dr. Brown. At that visit, Dr. Brown noticed that the plaintiff's speech was slurred and that he was walking with a "slump." Dr. Brown conducted a neurological examination and ordered that an MRI be conducted immediately.

Dr. Fisher, the radiologist who interpreted the MRI, reported that the scan was normal with the exception of a few bright spots. However, these spots were noted to be typical of a brain image of a much older man. Upon receiving the results of the MRI, Dr. Brown called the plaintiff at home to report that the MRI indicated patterns uncommon for a man of his age. Dr. Brown referred the plaintiff to a variety of physicians for consultation with respect to the plaintiff's neurological condition.

Dr. Brown subsequently referred the plaintiff to the world-renowned Mayo Clinic. In his letter of referral, he indicated that the plaintiff underwent an uneventful surgery and was subsequently discharged, but "[o]ver the ensuing 3 weeks, [the plaintiff] developed signs of neurological impairment that early on were easily confused with a prolonged difficult post-operative recovery." He further stated that "[a]n extensive review of his entire peri-operative experience

confirmed at no time was [the plaintiff] hypoxic, even momentarily, to explain [his neurological symptoms]."[3]

On July 9, 1996, the plaintiff experienced what he described as a "popping sensation in the head." Subsequently, his family noticed a marked improvement in his speech and gait. He was overjoyed at the improvement and even went to Dr. Brown's office on July 9, 1996, to share the good news with him. However, soon thereafter he began to experience headaches which were sometimes excruciating. At the time of trial, he continued to see Dr. Rankine for treatment of his headaches.

On June 8, 1998[4], the plaintiffs filed the instant action against the defendants.[5] In the complaint, the plaintiff averred that

> his consent to the surgery and treatment which he received at the hands of the defendants was not based upon adequate and sufficient information provided him by defendants as to the risks, dangers, need, and alternatives available to him, that he was not sufficiently informed as to the risks and dangers inherent in the surgery, and that his consent to his treatment was not therefore "informed consent", and further that the defendants were negligent by not adequately and sufficiently informing the plaintiff as to the need for the surgery, the risks he was facing, and the possible alternatives to the surgery, and that the advice rendered plaintiffs was below the applicable standard of care, and that said negligence in rendering said advice was the direct and proximate cause of plaintiffs injuries aforesaid. Alternatively, plaintiffs would show that the surgery was unnecessary and inappropriate for the condition for which [the plaintiff] suffered, that he was wrongfully and negligently diagnosed, and that, had adequate and sufficient care been rendered to plaintiff, the injuries aforesaid would not have occurred. Plaintiffs sue for wrongful battery and negligence arising out of their advice, care and treatment of [the plaintiff].

---

[3] There was considerable testimony at trial relative to the fact that the plaintiff's medical records fail to document that his oxygen was continuously monitored between 2:30 and 4:00 p.m. following his surgery. There was testimony that the plaintiff's neurological symptoms may have been related to a lack of oxygen or from carbon monoxide during the surgery. Several of the experts also testified as to whether or not the plaintiff could have been deprived of oxygen at some point, yet not evince any symptoms until 20 days after surgery. We mention this for context, but need not relate the details of this testimony since there is no issue on appeal regarding these facts.

[4] The plaintiff originally brought suit on April 2, 1997; that action was non-suited on June 9, 1997.

[5] The plaintiff also named Larry Blinn, a certified registered nurse anesthetist, as a defendant in this action. However, Mr. Blinn's motion for summary judgment was granted on November 8, 1999. The other defendants' motions were denied. The judgment in favor of Blinn was not appealed.

(Underlining in original). The alleged injuries include "memory loss, fatigue, nervousness, loss of good speech function, loss of coordination, severe and unrelenting headaches, [and] brain damage." The plaintiff sought damages for permanent physical impairment, mental and physical anguish, future medical expenses, and compensation for a loss in earning capacity. Mrs. Russell alleged loss of consortium. The plaintiff and his wife sought ten million dollars in damages.

The matter proceeded to a jury trial that commenced on April 20, 2004. Twenty-nine witnesses testified over the course of three weeks. At the conclusion of the trial, the jury returned a verdict for both defendants, finding that neither Dr. Brown nor Dr. Smith had been guilty of any negligence that proximately caused the plaintiff's injuries. The trial court entered judgment for the defendants on May 10, 2004. The plaintiff filed a motion to set aside the jury verdict and for a new trial, which motion was denied on June 28, 2004.

The defendants filed separate motions for discretionary costs pursuant to Tenn. R. Civ. P. 54.04(2). Dr. Brown sought an award of $41,335.58 in discretionary costs; Dr. Smith asked for $26,653.94. By orders entered June 28, 2004, the trial court awarded $15,712.82 to Dr. Brown, and $13,107.45 to Dr. Smith. The court's awards were limited to charges made by court reporters.

The plaintiff and his wife appeal the trial court's judgment on the jury's verdict. Dr. Brown and Dr. Smith challenge the adequacy of the court's discretionary costs awards.

II.

The plaintiff raises a number of issues on appeal relative to the jury verdict, the jury charge, and several evidentiary matters. First, the plaintiff challenges the jury's verdict assigning zero negligence to Dr. Brown on the informed consent issue. The plaintiff argues, among other things, that Dr. Brown breached his duty to obtain informed consent by failing to present him with non-surgical alternatives to remedy his snoring. He further challenges the jury charge on the issue of informed consent. He also raises evidentiary issues. His wife joins in these issues on appeal.

The defendants challenge these assertions. Additionally, they contend that the trial court erred in granting only part of their requests for discretionary costs. We will address these issues in turn.

III.

A.

The plaintiff's first issue concerns the question of whether Dr. Brown obtained informed consent by adequately advising him of the risks of, and the alternatives to, the surgical procedure performed. In particular, the plaintiff avers that Dr. Brown breached his duty by failing to inform him of non-invasive alternatives to surgery, and by failing to inform him of the diagnosis of sleep apnea so that he could be properly informed of any risks that stemmed from that diagnosis.

An informed consent medical malpractice claim[6] arises when the plaintiff authorized the procedure, but claims that the doctor failed to inform him or her of risks attendant to the procedure. *See Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998). It is premised on the idea that "a competent patient should be allowed to formulate an intelligent, informed decision about surgical or other treatment procedures the patient undertakes." *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998). Accordingly,

> [d]epending on the usual and customary advice given to patients to procure consent in similar situations, the health care provider must typically inform the patient of the diagnosis or nature of the patient's ailment, the nature of and the reasons for the proposed treatment or procedure, the risks or dangers involved, and the prospects for success. The patient must also be informed of alternative methods of treatment, the risks and benefits of such treatment and, if applicable, that the proposed treatment or procedure is experimental.

*Id.*, at 732 (internal citations omitted). This does not mean that a physician is obliged to advise a patient of every potential risk associated with a procedure, as to do so would be "humanly impossible." *Id.* at 733 (quoting *Longmire v. Hoey*, 512 S.W.2d 307, 310 (Tenn. Ct. App. 1974)). Rather, the sufficiency of the advice given "depends on the nature of the treatment, the extent of the risks involved, and the standard of care of the treating physician." *Cardwell v. Bechtol*, 724 S.W.2d 739, 749 (Tenn. 1987).

---

[6]An informed consent medical malpractice claim is distinguishable from a claim for a pure medical battery, which latter claim arises when a physician performs an *unauthorized* procedure. *See Blanchard v. Kellum*, 975 S.W.2d 522, 524(Tenn. 1998). The inquiry in such a case consists of determining (1) whether the patient was aware that the physician was going to perform the procedure, and (2) whether the patient authorized the procedure to be performed. *Id.* Although there is some discussion in the record about a difference between the UVPP procedure, which was indicated in the office notes, and the UPPP procedure, which was actually performed, the plaintiff's attorney stated at oral argument that the plaintiff's suit was not one for "medical battery." Therefore, we will confine our discussion in this case to the plaintiff's claim of an informed consent medical malpractice action. In any event, the only difference between the two procedures is apparently one of degree. On direct examination of Dr. Michael Jay Sillers, one of the defendants' expert witnesses, the following exchange took place:

> Q: Is there much distinction – we're talking about language here. Uvulopalatopharyngoplasty versus uvulopalatoplasty, what's the difference between those two, Doctor?
>
> A: Sometimes, there is no difference. You have uvulectomy, uvulopalatoplasty, uvulopalatopharyngoplasty. And it's a matter of degree, and it depends on – a lot of times, on the patient's anatomy, how long the uvula is, does the uvula extend far up into the palate, is there a significant contribution from the soft tissue that comes from where the tonsils sit. So a uvulopalatopharyngoplasty and a uvulopalatoplasty can be the same operation.

To prevail on an informed consent medical malpractice claim, a plaintiff must prove that which is set forth in Tenn. Code Ann. § 29-26-118 (2000):

> In a malpractice action, the plaintiff shall prove by evidence as required by § 29-26-115(b)[7] that the defendant did not supply appropriate information to the patient in obtaining informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which the defendant practices and in similar communities.

B.

The plaintiff takes the position that the defendants failed to "supply appropriate information to [him] in obtaining informed consent." Tenn. Code Ann. § 29-26-118. He alludes to various information which he claims should have been conveyed to him in order to make his consent informed in nature. Specifically, he faults Dr. Brown (1) for failing to inform him of non-surgical alternatives to remedy his snoring problem; (2) for failing to inform him of the diagnosis of sleep apnea; and (3) for neglecting to explain risks associated with that diagnosis.

In his brief, the plaintiff places great emphasis on the testimony of Dr. Jack Coleman, his standard of care expert. Dr. Coleman testified that Dr. Brown violated the standard of care by failing to notify the plaintiff of non-surgical alternatives and by failing to fully inform him of the risks associated with the UPPP procedure. With respect to informing the plaintiff of non-surgical alternatives, Dr. Coleman testified that when a person complains of snoring, the physician should inform the patient of non-surgical alternatives such as a CPAP machine or laser surgery. He further stated that a physician should order a sleep study to determine if sleep apnea is present and, if so, the severity of same. However, despite his repeated assertions that a sleep study was required to properly diagnose sleep apnea, he conceded that some medical judgment was involved. He acknowledged that he did not send every patient who presented symptoms of sleep apnea for a sleep

---

[7]Tenn. Code Ann. § 29-26-115(b) (2000) provides as follows:

> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

study. He further agreed that the method for identifying the location in the throat that was causing snoring did not require a sleep study.

Dr. Coleman also opined that the medical records did not contain adequate documentation of informed consent. Dr. Brown's office notes indicate the following: "surgery discussed, risks and complications, schedule tonsillectomy, septoplasty, UVPP." However, Dr. Coleman found this insufficient, as he stated that the standard of care required Dr. Brown to enumerate every risk discussed. The plaintiff urges us to reverse the trial court's judgment and remand for a new trial, primarily based upon Dr. Coleman's testimony.

The plaintiff misconstrues our standard of review. The issue before us is *not* whether there is material evidence to support the plaintiff's theory of informed consent medical malpractice. There clearly is; but that is not the issue for us. Since the jury found for the defendants, and the trial court approved the verdict, our review is limited to determining whether there is material evidence in the record to support the *jury's* verdict. *See* Tenn. R. App. P. 13(d); *Moss v. Sankey*, 54 S.W.3d 296, 298-99 (Tenn. Ct. App. 2001). We hold there is.

In addition to his own testimony, Dr. Brown presented the expert testimony of Dr. James L. Netterville and Dr. Michael Jay Sillers. Both are otolaryngologists, as is Dr. Brown. Both are board-certified surgeons; each testified that they had performed the type of surgery performed on the plaintiff in the instant case.

Each of Dr. Brown's medical experts testified extensively regarding the standard of care applicable to the plaintiff's surgery. The record is clear that both experts were aware of what the plaintiff was told and what he was not told. Both testified, based on their knowledge of the standard of care, that the plaintiff's consent to the surgery performed by Dr. Brown was informed. The jury further had before it the consent form signed by the plaintiff on April 4, 1996. That form included the following statement:

> I hereby certify that I have read and fully understand the above Authorization for Surgeon to Operate, the reasons why the above-named surgery is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by Dr. Brown.

In the instant case, both sides presented competent expert testimony pertaining to the standard of care and whether Dr. Brown supplied the plaintiff with "appropriate information" to enable the plaintiff to give his "informed consent." Tenn. Code Ann. § 29-26-118. The jury determined that the evidence did not preponderate in favor of the plaintiff. In view of the positive testimony of Drs. Netterville and Sillers indicating, in effect, that the plaintiff was supplied with "appropriate information . . . in obtaining informed consent," Tenn. Code Ann. § 29-26-118, we conclude that

there is material evidence to support the jury's verdict for Dr. Brown on the "informed consent" issue. The plaintiff's first issue is found adverse to him.[8]

IV.

The plaintiff also challenges the propriety of the trial court's charge on the informed consent issue. The determination of whether jury instructions are proper is a question of law which this court reviews *de novo* with no presumption of correctness. *See Solomon v. First Am. Nat'l Bank*, 774 S.W.2d 935, 940 (Tenn. Ct. App. 1989). We must consider the jury charge as a whole, and decline to invalidate it if it fairly defines the legal issues in the case and does not mislead the jury. *See Hunter v. Burke*, 958 S.W.2d 751, 756 (Tenn. Ct. App. 1997).

The plaintiff appears to challenge the following charge on the issue of consent:

> As a general matter, the law presumes the persons – by the way, I should mention that there is an allegation of – they introduced to you a consent form that the patient signed going to the hospital. As a general matter, the law presumes that persons who sign documents, that have been given that – been given an opportunity to read it, are bound by their signatures.
>
> This rule applies in informed consent cases. Thus, the law presumes that patients ordinarily read and take whatever other measures are necessary to understand the nature, terms and general meaning of consent forms involving medical treatment. The existence of a signed consent form gives rise to a presumption of consent in the absence of proof of misrepresentation and inadequate disclosure, forgery or lack of capacity.
>
> Accordingly, if an executed consent form expressly covers the surgery performed on the patient and no expert's testimony completely undermines the validity of that consent, the surgery is not a battery, if there is no evidence of a lack of informed consent.
>
> Ladies and gentlemen, the reason that is general law is everybody that signs a consent form, all they would have to do to get out of it is say: "I didn't read it."

---

[8]The plaintiff contends that our decision in *Bates v. Metcalf*, No. E2001-00358-COA-R3-CV, 2001 WL 1538535, at *6 (Tenn. Ct. App. E.S., filed December 3, 2001) was wrongly decided. He apparently perceives that our decision in that case is an impediment to his successful pursuit of this appeal. He urges us to overrule *Bates*. That case involved a claim of *medical battery*, a cause of action not present on this appeal. In any event, we decline the plaintiff's invitation to revisit our holding in *Bates*.

-10-

This court has consistently held that when a patient signs a written consent form covering a particular procedure, that form will ordinarily control the question of whether or not the patient consented to the procedure. *See Church v. Perales*, 39 S.W.3d 149, 161 (Tenn. Ct. App. 2000). In fact, the language in **Church** mirrors that included in the trial court's charge to the jury:

> As a general matter, the law presumes that persons who sign documents, having been given an opportunity to read them, are bound by their signatures. . . . Thus, the law presumes that patients ordinarily read and take whatever other measures are necessary to understand the nature, terms, and general meaning of consent forms involving medical treatment.

*Id.* (internal citation omitted). Accordingly, we do not find error in the trial court's charge to the jury on the general subject of consent.

It should be noted that the subject charge only addresses the concept of consent in general, and not the issue of "informed consent." Following the above-cited charge, the trial court continued to charge the jury with, among other things, the plaintiff's burden of proof in an action for *informed* consent, and the objective standard by which the jury was to assess causation. We find no error in the trial court's charge regarding informed consent.

V.

A.

The plaintiff also raises several alleged evidentiary issues. As the propriety, scope and control of the examination of witnesses rests within the sound discretion of the trial court, we review these alleged errors under an abuse of discretion standard. *See Woods v. Herman Walldorf & Co., Inc.*, 26 S.W.3d 868, 877 (Tenn. Ct. App. 1999) *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). We will address each in turn.

B.

First, the plaintiff argues that the trial court erred when it refused the plaintiff's request that one of the defense expert witnesses, Dr. Netterville, be directed to respond to his counsel's question with a "yes" or "no" response. The plaintiff contends that the trial court's error precluded his counsel from conducting an effective cross examination of Dr. Netterville; in particular, he argues that the trial court's ruling interfered with his ability to highlight the deficiencies in Dr. Netterville's opinion testimony.

When counsel for the plaintiff insisted that the witness answer a question "yes" or "no" before further explaining his answer, the trial court interrupted:

THE COURT: He doesn't have to say yes or no, for the record, if it can't be answered yes or no. That's a decision for the doctor to make.

Following the trial court's comment, the witness asked plaintiff's counsel "what the question was." Counsel responded as follows:

No. I'll withdraw the question and move on here. Doctor, I'm not here for fun, and I hope you're not either.

Since counsel withdrew his question, the plaintiff cannot be heard to complain of the trial court's ruling on counsel's request for a "yes" or "no" answer. *See* Tenn. R. App. P. 36(a). The subject question was no longer there to be answered.

C.

The plaintiff next argues that the trial court erred in permitting the defense to cross examine a witness on the subject of prior charitable contributions made by the plaintiff.

During the cross-examination of Donald Carpenter, the certified public accountant called by the plaintiff to testify as to the damages sustained by the plaintiff, counsel for Dr. Smith asked about the plaintiff's charitable contributions and how they impacted his annual income. Plaintiff's counsel objected to this line of questioning, as indicated in the following excerpt from the trial transcript:

[Plaintiff's counsel]: [W]ith regard to asking him anything, the only purpose of it is to inflame the jury, as to whether he gave enough or – too little or too much in charity. We have already stipulated to the income tax returns. They show what he got. If he didn't do charity, then the amount will be larger, and so it would benefit them, not hurt them. And the only reason they're doing this is to inflame the jury. That's why we filed the motion in limine.

THE COURT: They have a right to cross examine him. He has come up with four or five million dollars in damages. They have a right to ask him about it.

[Plaintiff's counsel]: The charitable contributions are irrelevant.

THE COURT: If he didn't give a lot, it ought to be higher. That might help you.

[Plaintiff's counsel]: No it doesn't help us. That's the reason she's bringing it out. It's irrelevant.

-12-

THE COURT: If they saved it or spent it, you can't come in and hide part of it, for the record. He comes in asking for all these millions of dollars. He has to get up to there and face the music. I don't know what it is. . . .

The court further stated that "[i]f it's in the records he relied on, they can ask about it."

The plaintiff argues that the claim was for loss in earning capacity, not a claim for lost earnings, and consequently, according to the plaintiff, this evidence was irrelevant. The plaintiff, however, has cited no authority to support his argument. The defendants argue that it was proper for the court to permit this testimony, as the plaintiff claimed to have suffered an economic loss of between $4.1 and $5.1 million.

We hold that the trial court did not abuse its discretion. The plaintiff presented evidence from a certified public accountant, and during the course of his direct examination, tendered his tax returns into evidence. The subject question was a part of counsel's cross examination to test the accuracy of the plaintiff's very substantial claimed losses resulting from the alleged malpractice of the defendants. The defendants had a right to examine the CPA with respect to the entries on the plaintiff's tax returns. While the issue before the jury was loss of earning *capacity*, the plaintiff's earnings prior to, and following, the surgery were certainly relevant to the issue of loss of earning capacity. However, even if we were to hold that the examination regarding charitable contribution was not relevant, we cannot say that the questioning more probably than not affected the jury's verdict. Tenn. R. App. P. 36(b).

D.

The plaintiff also contends that it was improper to permit defense counsel to question one of the plaintiff's expert witnesses about the plaintiff's credibility. In particular, he challenges the propriety of the following exchange between Dr. Smith's attorney and the plaintiff's standard of care expert, Dr. Coleman:

Q: Okay. Now we're going to be basing a lot of things on the credibility of Dr. Smith, Dr. Brown, Angie Russell, Emerson Russell to figure out what happened. Right?

A: Yes, ma'am.

Q: Okay. Now, did you – when you read Emerson Russell's deposition, did you see anything that made you feel like you might need to question his credibility?

A: No, ma'am.

\* \* \*

Q: Because they brought a loss of consortium claim, which includes a loss of sex claim, in this case. This question was asked – let me ask you first. Do you remember how often Emerson Russell said in his deposition he had sex with his wife –

A: No, ma'am.

\* \* \*

Q: . . . He's asked this question: "Prior to this, prior to these incidents, did you and your wife have sex regularly?" And he says: "Yes, sir." Right?

A: That's correct.

Q: And then the question was asked: "And I guess, when I say regularly, I mean two or three times a week or more. Right?" And what did Emerson Russell say how often he had sex per day before the surgery? Per day, sir.

A: I don't know. You tell me. I don't know.

\* \* \*

Q: Two or three times a day. Well, let's talk about common sense and speculation. I want you to assume that Emerson Russell's net worth has increased from one million dollars in 1996 to thirteen million dollars today. I want you to further assume that this is true testimony, that his sex life was two or three times a day with his wife before the surgery, and now it's very infrequent. Given the type [sic] speculation and logic going on in this case, do you think we need to assume that the less sex he has, the more money he makes?

[Plaintiffs' counsel]: I'd object. This is – I know she'd like to testify, but I object to this.

[Defense counsel]: You think that makes logical sense?

[Plaintiffs' counsel]: It's an improper question.

THE COURT: You can answer.

A: No, ma'am.

* * *

Q: Let me finish my question. Whether it's speculation, logic, what do you think? You think there's any one-on-one correlation between two or three times sex per day to his financial increase, his net worth increase? You think we're going to bootstrap those numbers together?

A: I think it's a non sequitur.

The plaintiff made a timely objection to the question, and therefore it is properly before us. *See* Tenn. R. App. P. 36(a). However, we may only set aside a judgment if the "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

The question which brought forth the objection is as follows: "[D]o you think we need to assume that the less sex he has, the more money he makes?" Apparently, the question was intended to bring into question the plaintiff's credibility.

We find that the trial court erred in permitting this question. Dr. Coleman was called to articulate his opinions as to the relevant standard of care for an otolarynologist in Dr. Brown's community and related issues. He reviewed the plaintiff's deposition testimony in preparation for trial. However, we do not find that the doctor's review of the plaintiff's deposition opened the door for counsel to question him about statements pertaining to a possible correlation between the frequency of the plaintiff's sexual activity and his income or the bearing of these matters on the plaintiff's credibility. The question is clearly improper for any number of reasons: it is argumentative; it seeks an opinion in an area for which the witness has not been qualified and for which he does not claim expertise;[9] it seeks a response, the relevancy of which is highly suspect; it seemingly seeks to establish that one cannot go from making less money to making more money while one is trending down in sexual activity – a conclusion which, at best, is debatable; and probably for other reasons.

Although we find that it was error to permit this line of questioning, we do not find that it substantially prejudiced the plaintiff such that we should set aside the judgment. We cannot say that the trial court's decision to permit this line of questioning, although an abuse of discretion, "more probably than not affected the judgment." Tenn. R. App. P. 36(b).

---

[9]The court is unaware of an area of expertise that would encompass the subject of the alleged correlation, even assuming it was relevant; but the court is sure there is one.

VI.

The defendants also filed notices of appeal on the issue of discretionary costs. Both defendants filed a motion for discretionary costs in which they listed, in an extensive and comprehensive fashion, each expert witness for whom costs were sought, the purpose of that person's testimony, and the costs associated with their testimony at deposition and trial. Both motions were properly supported by exhibits and affidavits from the parties' respective attorneys. As previously noted, Dr. Brown and Chattanooga Ear, Nose & Throat Associates sought costs in the amount of $41,335.58; Dr. Smith and Anesthesiology Consultants Exchange, Inc. sought $24,653.94.

Tenn. R. Civ. P. 54.04(2), which permits the trial court to award discretionary costs, provides as follows:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment. The trial court retains jurisdiction over a motion for discretionary costs even though a party has filed a notice of appeal. The court may tax discretionary costs at the time of voluntary dismissal.

In determining whether to award discretionary costs, a trial court is instructed to (1) determine whether the party seeking the costs is the "prevailing party"; (2) limit awards to those costs specifically enumerated in the rule; (3) determine if the requested costs are "necessary and reasonable"; and (4) determine whether the prevailing party has engaged in conduct during litigation that warrants depriving it of the costs to which it might otherwise be entitled. *Mass. Mutual Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002). It is incumbent upon the party seeking these costs to demonstrate that it is entitled to recover them. *Id.* at 36. This may be accomplished by filing a properly-supported motion for discretionary costs. *Stalsworth v. Grummons*, 36 S.W.3d 832, 836 (Tenn. Ct. App. 2000). The nonmoving party may challenge the motion by presenting argument and evidence contesting the reasonableness and necessity of the fees. *Id.* Although the equities of the case may factor into a court's decision, the court "*should . . .* award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." *Mass. Mutual Life Ins. Co.*, 104 S.W.3d at 35 (emphasis added).

-16-

Awarding costs in accordance with these principles is within the trial court's discretion. *Id.* at 35. Accordingly, in reviewing the trial court's award or decision not to award costs, we employ an abuse of discretion standard. *Id.* We cannot substitute our judgment for that of the trial court. *Id.* A trial court abuses its discretion when it "applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Id.*

By motion filed June 8, 2004, Dr. Brown and Chattanooga Ear, Nose & Throat Associates, P.C., sought to be reimbursed for the following: (1) expert witness fees charged by the plaintiff's experts in connection with their discovery depositions and the court reporters' charges for those depositions; (2) expert witness fees charged by the defendants' experts; (3) costs associated with the depositions of the parties, the plaintiffs' lay witnesses, and treating nurses; and (4) costs and fees associated with trial, such as the per diem charges for transcribing testimony. In support of their motion, their counsel submitted an affidavit averring that "[t]he fees and costs requested pursuant to Tenn. R. Civ. P. 54.04(2) . . . are reasonable in amount," and that they were necessary in the defense of Dr. Brown and Chattanooga Ear, Nose & Throat Associates.

On June 8, 2004, Dr. Smith and Anesthesiology Consultants Exchange filed a similar motion, with the attached affidavit of their attorney, stating that the expenses enumerated were reasonable and necessary. The plaintiff did not file a written response to these motions; accordingly, there is no affidavit from plaintiff's counsel or other affidavits contesting that these expenses are reasonable and necessary.

In the hearing on June 25, 2004, plaintiff's counsel verbally responded to the motion. He argued that the expert fees, some of which amounted to $6,000, were excessive. The defendants argued that the fees commanded by their experts were commensurate with those demanded by the plaintiff's experts; therefore, according to them, it cannot be said that their fees were unreasonable. Plaintiff's counsel retorted, however, that all of their fees were excessive, and the court should determine the reasonableness of an expert fee, not relative to other medical professionals, but relative to cost in general. The court ultimately limited its awards to the court reporter fees.

We find that the court abused its discretion in limiting its award of discretionary costs to the charges of court reporters. First, both defendants submitted affidavits in support of their motions attesting to the reasonableness and necessity of the expenses incurred. The plaintiff presented no counter-affidavits. Although the plaintiff claimed at oral argument that the charges commanded by the experts were unreasonable and excessive, we find this does not suffice to dispute the defendants' verified claims to the contrary. Second, it is entirely appropriate to award fees for expert witnesses. *See* Tenn. R. Civ. P. 54.04(2); *Stalsworth*, 36 S.W.3d at 835. Our courts have even extended this to fees incurred for experts who do not actually testify at trial. *Id.* Consequently, where the plaintiff has failed to proffer any evidence to challenge the reasonableness or necessity of the experts, *e.g.*, that their testimony was cumulative or unhelpful, we find that the trial court abused its direction in declining to award these fees to the defendants. Case precedent has established that a trial court *should* award fees that are identified in Tenn. R. Civ. P. 54.04(2) and are reasonable and necessary.

-17-

*See Mass. Mutual Life Ins. Co.*, 104 S.W.3d at 35. In the absence of any evidence to the contrary, we find that the costs sought should have been awarded.

Accordingly, we vacate the amounts of the awards of discretionary costs. The plaintiff argued that the charges sought for the videographer are not covered by Tenn. R. Civ. P. 54.04(2). Counsel for Dr. Brown responded that if the court determined those costs incurred from taking video proof in three depositions were not appropriate, they took no issue with that. The expense of a videographer is not listed in Rule 54.04(2). Accordingly, the trial court is directed not to award the fees of the videographer. Otherwise, the trial court is directed, on remand, to enter an order awarding the full amount of costs sought by the defendants.

## VII.

The judgment of the trial court predicated on the jury's verdict is hereby affirmed. The trial court's judgment with respect to the defendants' motions for discretionary costs is hereby vacated. We remand this case to the court below for the entry of an order awarding the defendants the full amount of their requested discretionary costs, save for the videographer's fees. Costs on appeal are taxed to the appellants, Emerson Russell and Angie Russell.

_____
CHARLES D. SUSANO, JR., JUDGE

-18-