IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2009 Session

## LOU ELLA SHERILL, ET AL. v. BOB T. SOUDER, M.D., ET AL.

Direct Appeal from the Circuit Court for Madison County
No. C04-5    Donald H. Allen, Judge

No. W2008-00741-COA-R3-CV - Filed February 27, 2009

This is a medical malpractice case. The trial court granted summary judgment in favor of Appellee
doctor finding that, based upon the discovery rule, the one year statute of limitations for a medical
malpractice claim had expired prior to the filing of the Appellants' complaint. Finding no error, we
affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J., joined.
DAVID R. FARMER, J., Not Participating.

Edmund J. Schmidt, III, David Randolph Smith, Nashville, TN, Daniel J. McGlynn, Baton Rouge,
LA, for Appellants, Lou Ella Sherill and Barbara A. Pigg

Jeffrey L. Lay, Dyersburg, TN, for Appellees, Bob T. Souder, M.D., and Transouth Healthcare
Center, P.C.

OPINION

        In March 2002, Lou Ella Sherrill, a resident of Willow Springs, Missouri, was visiting her
daughter, Appellant Barbara A. Pigg in Jackson, Tennessee. During her visit, Ms. Sherrill developed
nausea and vomiting. On March 11, 2002, Ms. Sherrill went to TransSouth Health Care Center, P.C.
and was seen by Michael Briley, F.N.P. Mr. Briley prescribed Ms. Sherrill 30 milligrams of Reglan
per day. The next day, Ms. Pigg called the clinic to inform Mr. Briley that her mother was still
experiencing nausea and vomiting. In addition to the Reglan, Mr. Briley also prescribed Phenegran.

        On March 17, 2002, Ms. Pigg again called the clinic to advise that Ms. Sherrill's symptoms
had not abated, and that the Phenegran was causing Ms. Sherrill to experience severe drowsiness.
Mr. Briley ordered an abdominal ultrasound, which was performed on March 18, 2002. The

ultrasound showed gallstones in the gallbladder; however, the gallbladder wall was normal. No other abnormalities were seen.

Mr. Briley referred Ms. Sherrill to Dr. George Thomas for surgical consultation. On March 19, 2002, Dr. Thomas saw Ms. Sherrill, who complained of nausea and vomiting for the previous sixteen days. Dr. Thomas referred Ms. Sherrill to Dr. Bob Souder (together with TransSouth Healthcare Center, P.C., "Appellees"). Dr. Souder performed an upper panendoscopy on March 20, 2002. Dr. Souder ultimately diagnosed Ms. Sherrill with severe gastroesophageal reflux disorder, a 9 centimeter hiatal hernia, gastroparesis, and chronic active gastritis. Because Ms. Sherrill had failed to respond to the dosage of Reglan prescribed by Mr. Briley, Dr. Souder increased Ms. Sherrill's Reglan, and scheduled a follow-up visit for April 18, 2002. At that appointment, Ms. Sherrill was seen by nurse practicioner Stacey Hodges. At this visit, Ms. Sherrill was not having any vomiting or other complaints. Ms. Sherrill soon returned to her home in Missouri, and requested that her medical records be forwarded to her family physician, Dr. Ramond Lewandowski.

In the summer of 2002, Ms. Sherrill developed a movement disorder that involved her face, jaw and extremities. Despite treatment from Dr. Lewandowski, the movement disorder became progressively worse. By August of 2002, Ms. Sherrill's leg movements were so drastic that she was constantly patting her feet and kicking her legs. Ms. Sherrill also suffered from constant chewing motions. During this entire period, Ms. Sherrill continued to take the Reglan as prescribed by Dr. Souder.

Dr. Lewandowski referred Ms. Sherrill to Dr. Clara Applegate, a neurologist in West Plains, Missouri, who saw Ms. Sherrill for the first time on December 18, 2002. At that appointment, Dr. Applegate allegedly informed Ms. Sherrill that the movement disorder might have been triggered by the Reglan, and that stopping the medication might abate the symptoms. Ms. Sherrill was ultimately diagnosed with tardive dyskinesia. She continued to be treated by Dr. Applegate. By March 18, 2004, Ms. Sherrill's tardive dyskinesia symptoms had resolved. When Dr. Applegate last saw Ms. Sherrill in December 2005, she was free of any symptoms. Ms. Sherrill died of unrelated conditions on September 26, 2007.

On January 8, 2004, Ms. Sherrill and Ms. Pigg filed suit against Dr. Souder and TransSouth Healthcare Center, P.C., alleging that Dr. Souder had breached the accepted standard or care by prescribing Reglan for long-term use, and that Dr. Souder's negligence had caused Ms. Sherrill to develop tardive dyskinesia. An Amended Complaint was filed on April 8, 2004.[1]

On February 11, 2008, Dr. Souder and TransSouth moved for summary judgment pursuant to Tenn. Code Ann. §§ 29-26-116 and 28-3-104. The gravamen of the motion was that the Appellants' suit was time-barred because Dr. Applegate had diagnosed Ms. Sherrill with tardive

---

[1] On February 28, 2008, Ms. Pigg moved to amend the complaint to substitute herself as the sole plaintiff due to Ms. Sherrill's death.

dyskinesia on December 18, 2002.[2]  On February 21, 2008, Appellants filed documentation in opposition to the motion for summary judgment.  Specifically Appellants assert that there are issues of material fact as to when they were fully informed of Ms. Sherrill's tardive dyskinesia diagnosis, as well as to when they discovered that Dr. Souder's prescribing long-term Reglan use constituted negligent conduct.

The motion for summary judgment was heard on March 7, 2008.  On April 2, 2008, the trial court granted the motion for summary judgment, finding that "Ms. Sherrill's cause of action accrued and the one year statute of limitations commenced to run on December 18, 2002; that the Complaint was filed more than one year later on January 8, 2004; and, that Ms. Sherrill was not suffering from any disability at the time the cause of action accrued which would justify the tolling of the one year statute of limitations."

Ms. Pigg appeals.  The sole issue before this Court is whether the trial court erred in granting summary judgment in favor of Appellees finding that the statute of limitations had expired.

It is well settled that a motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery material, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. at 211 (citations omitted).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). Because only questions of law are involved, there is no presumption of correctness regarding a trial court's grant or denial of summary judgment. *See Bain*, 926 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W .2d 722, 723 (Tenn.1997).

---

[2] On August 3, 2005, Appellees filed an initial motion for summary judgment on the merits of liability.  On February 8, 2006, Appellees moved to strike this motion.

Tenn. Code Ann. § 28-3-104 mandates a one year statute of limitations from the date of accrual of a medical malpractice claim.  Concerning the accrual of the action, Tenn. Code Ann. § 29-26-116 states, in relevant part:

> (a)(1) The statute of limitations in malpractice actions shall be one (1) year as set forth in § 28-3-104.
> (2) In the event the alleged injury is not discovered within such one (1) year period, the period of limitation shall be one (1) year from the date of such discovery.
> (3) In no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after discovery that the cause of action exists.

Under this statute, which is known as the "discovery rule," the statute of limitations "commences to run when the patient 'discovers, or reasonably should have discovered, (1) the occasion, the manner, and the means by which a breach of duty occurred that produced [the patient's] injuries; and (2) the identity of the defendant who breached the duty.'"[3] *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn.1998) (quoting *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn.1997)).

The discovery rule, which is at the center of this issue, is succinctly explained by the Tennessee Supreme Court as follows:

> The plaintiff may not ... delay filing suit until all the injurious effects and consequences of the alleged wrong are actually known to the plaintiff. *Wyatt v. A-Best Company*, 910 S.W.2d 851, 855 (Tenn.1995). Similarly, the statute of limitations is not tolled until the plaintiff actually knows the "specific type of legal claim he or she has," *Stanbury*, 953 S.W.2d at 678, or that "the injury constituted a breach of the appropriate legal standard," *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn.1994). Rather, as we have recently emphasized, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant. *Stanbury*, 953 S.W.2d at 677; *see also Roe*, 875 S.W.2d at 657 ("The plaintiff is deemed to have

---

[3] The discovery rule was deemed necessary to "alleviate the intolerable result of barring a cause of action by holding that it 'accrued' before the discovery of the injury or the wrong," *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn.1998) (quoting *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982)).  Otherwise, a plaintiff would be required to sue to vindicate a wrong at a time when the injury was "unknown or unknowable." *Id*. (quoting *Stanbury v. Bacardi*, 953 S.W.2d 671 (Tenn.1997)).

discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct."). "It is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial." ***Stanbury***, 953 S.W.2d at 678. Such knowledge includes not only an awareness of the injury, but also the tortious origin or wrongful nature of that injury. ***Hathaway v. Middle Tennessee Anesthesiology, P. C.***, 724 S.W.2d 355, 359 (Tenn.App.1986).

[***Shadrick***, 963 S.W.2d at 733-34].

In their statement of undisputed material facts in support of the motion for summary, Appellees contend that Appellant's cause of action accrued on December 18, 2002. On that date, Appellees assert that "Dr. Applegate fully informed both Ms. Sherrill and Ms. Pigg that Ms. Sherrill's movement disorder was tardive dyskinesia that was caused by taking the drug Reglan." Appellees further contend that, on that date, Dr. Applegate instructed Ms. Sherrill to discontinue the Reglan, and informed her that so doing would likely end her symptoms.

On February 21, 2008, Appellant filed a statement of undisputed material facts in opposition to the motion for summary judgment. Therein, Ms. Pigg asserts that she did not attend her mother's December 18, 2002 appointment with Dr. Applegate. Although Ms. Pigg states that she did attend Ms. Sherrill's January 16, 2003 appointment with Dr. Applegate, she contends that neither Dr. Applegate, nor her physician's assistant, Brian Lenahan, mentioned that prescribing Reglan for long-term use was in violation of the professional standard of care. In fact, in the statement of undisputed material facts, Ms. Pigg asserts that she did not discover the connection until the late spring or early summer of 2003 through her own internet research. We note that Ms. Pigg contradicts this assertion in her deposition testimony:

Q [to Ms. Pigg]. When did you–when were you first–Or when did you first learn that Reglan might be a possible cause of your mother's movement disorder?

A. Brian Lenahan told me that it was the cause.

Q. When did he tell you that?

A. At the January, February visit....

Q. So it would have been January of 2003?

A. Yes.

Q. Up until that time had anyone told you there might be any adverse effect of taking Reglan?

A. No.

Dr. Clara Applegate was also deposed. She testifies that Ms. Pigg did attend Ms.Sherrill's December 18, 2002 appointment. Dr. Applegate testifies as follows concerning what transpired at the December 18, 2002 visit:

Q. ...As far as sitting down and talking with Ms. Sherrill on that first visit, was she able to talk with you in a normal way and understand what you were telling her?

A. She was. She gave the history and her daughter helped her. Ms. Sherrill did the majority of the talking....

Q. It appears from your office note on that first visit that you diagnosed Ms. Sherrill's condition as tardive dyskinesia?

A. I did.

*                              *                              *

Q. Is stopping the offending medication the primary treatment of choice for this condition?

A. It is.

Q. And based upon your review of Ms. Sherrill's medication history, did you determine what you felt to be the offending medication in this case.

A. I did. She was on [Reglan]...and it was my theory that that was the cause of her movement disorder.

*                              *                              *

Q. All right. After you made your assessment in this initial visit on December 18, 2002, what did you tell Ms. Sherrill?

A. I asked Ms. Sherrill to stop taking the Reglan and told her I would see her back in two to three weeks....

        *                 *                 *

Q. Now let me ask you a little more about your conversation with Ms. Sherrill and her daughter on December 18, 2002. Did you tell them that, even though it's a medical term, did you tell them that you thought she had tardive dyskinesia?

A. I think I probably did. I probably said, no, I didn't. I wouldn't have said that. I would have said–

Q. What would you have told them?

A. I would have told them that I thought she had a movement disorder that might have been triggered by the medication and that stopping the medication might take care of it.

Q. In having such a conversation would you emphasize to the patient, and in this case did you emphasize to the patient the importance of stopping the Reglan?

A. Yes.

Q. Did you go into any detail at that time or give them any explanation as to how Reglan or other drugs can cause this movement disorder?

A. I explained that any exposure to these medications can trigger such a disorder and that the side effects look like Parkinson's Disease in many cases and I felt that that was what was wrong with her.

Dr. Applegate's testimony that Appellant was informed of her condition and the likely cause on December 18, 2002 is further supported by Ms. Pigg's deposition testimony that Ms. Sherrill executed a durable power of attorney on January 6, 2003:

Q. [T]here's a durable power of attorney that Ms. Sherrill executed, making you her attorney in fact–

A. Um-hum.

Q. –that was dated January 6, 2003.

A. (The witness nodded.)

-7-

Q. Why did you have that durable power of–Or why did she execute
that durable power of attorney, if you know?

A. *That was after she was diagnosed with the tardive dyskinesia*....

(Emphasis added).

The record indicates that, following the December 18, 2002 appointment with Dr. Applegate, Ms. Sherrill's next appointment was not until at least January 16, 2003. Although Ms. Pigg contends that neither she, nor her mother, knew about the tardive dyskinesia, or its cause, until at least January 16, 2003, Ms. Pigg's testimony above indicates otherwise. Ms. Pigg's statement that her mother executed the January 6, 2003 power of attorney based, in part, upon the diagnosis of tardive dyskinesia, indicates that Ms. Sherrill knew about the diagnosis at the time she executed the power of attorney. Giving every inference in favor of the Appellant as the non-moving party, at latest, Appellant knew about the diagnosis on January 6, 2003. Even if the one year statute of limitations began to run on that day, the complaint in this case was not filed until January 8, 2004. Consequently, we agree with the trial court's conclusion that the expiration of the statute of limitations bars Appellant's case.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Barbara A. Pigg and her surety.

_____

J. STEVEN STAFFORD, J.